**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

KRISTIN NICHOLS, an individual,

      Plaintiff,

v.

THE ADAMS COUNTY BOARD OF COUNTY COMMISSIONERS, a local government entity; ADAMS COUNTY DEPARTMENT OF HUMAN SERVICES, DIVISION OF CHILDREN AND FAMILY SERVICES, a division of Adams County; JENNIFER CONN, individually; ISABELLA VALDEZ, individually; ANNE SCHMECKPEPER, individually; CITY OF AURORA, a municipality; DETECTIVE NATHANIEL MOSS, individually; and POLICE CHIEF VANESSA WILSON, individually.

      Defendants.

_____

**COMPLAINT AND REQUEST FOR JURY TRIAL**
_____

      Kristin Nichols, through her counsel, Thomas Mitchiner, Mitchiner Law LLC, and Nathaniel J. Thompson of the Law Offices of Nathaniel J. Thompson, submits her Complaint and Request for Jury Trial, asserting claims against the Defendant, Adams County Board of County Commissioners, Adams County Department of Human Services, Division of Children and Family Services, Jennifer Conn, Isabella Valdez, Anne Schmeckpeper, City of Aurora, Detective Nathaniel Moss, and Chief of Police Vanessa Wilson, and states as follows:

**INTRODUCTION**

A purpose of Colorado's Children's Code is to strengthen and preserve family bonds. This case is about what happens when people use the Children's Code to break family bonds. The Defendants, as described below, did exactly this to Plaintiff Kristin Nichols and her family.

Ms. Nichols asserts claims against the Adams County Board of County Commissioners, Adams County Department of Human Services, Division of Children and Family Services, Jennifer Conn, Isabella Valdez, and Anne Schmeckpeper for violating her Fourteenth Amendment right to custody and companionship with her daughter. Ms. Nichols also asserts claims against the above Defendants for violating Title II of the Americans with Disabilities Act [ADA].

Further, Ms. Nichols asserts claims against the City of Aurora, Detective Nathaniel Moss, and former Police Chief Vanessa Williams for violating her Fourth Amendment right by securing an arrest warrant for Ms. Nichols based on false or incomplete information.

**I.     PARTIES**

1.     Kristin Nichols [Nichols] is a resident of the state of Colorado.

2.     The Adams County Board of County Commissioners [Adams County] is a local government body and a person under 42 U.S.C. §1983 [Section 1983].

3.     The Adams County Department of Human Services, Division of Children and Family Services [Adams Family Services] is a department of Adams County and a person under Section 1983.

4.      At all times relevant to the subject matter of this litigation, Adams County and Adams Family Services were responsible for the oversight, supervision, discipline, and training of its employees.

5.      Jennifer Conn [Conn] is a Guardian Ad Litem, a resident of Colorado, and is sued in her individual capacity and is a person under Section 1983.

6.      Isabella Valdez [Valdez] is a Caseworker with the Adams Family Services, a resident of Colorado, and is sued in her individual capacity and is a person under Section 1983.

7.      Anne Schmeckpeper [Schmeckpeper] is a Caseworker with Adams Family Services, a resident of Colorado, and is sued in her individual capacity and is a person under Section 1983.

8.      The City of Aurora [Aurora] is a municipality organized under Colorado law and is a person subject to suit under Section 1983. The Aurora Police Department [APD] is a law enforcement agency that is part of Aurora.

9.      At all times relevant to the subject matter of this litigation, Aurora was responsible for the oversight, supervision, discipline, and training of the officers employed by APD.

10.     Detective Nathaniel Moss [Moss] is a Police Detective with APD, a resident of Colorado, and is sued in his individual capacity and is a person under Section 1983.

11.     Police Chief Vanesa Wilson [Wilson] was the APD police chief, a resident of Colorado, and is sued in her individual capacity and is a person under Section 1983.

3

## II.     JURISDICTION AND VENUE

12.     Plaintiff's claims arise under the Constitution and laws of the United States.

13.     This Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

14.     The federal rights asserted by Plaintiff are enforceable under 42 U.S.C. § 1983.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because all the events that give rise to this claim occurred in Colorado within this judicial district. All Defendants and the Plaintiff reside in this judicial district.

## III.     GENERAL ALLEGATIONS

**A.     Kristin Nichols meets Robin Niceta.**

16.     Nichols is the mother of M.N.

17.     M.N. was born in April 2016.

18.     Nichols is a Registered Nurse.

19.     Robin Niceta [Niceta] was formerly a Caseworker for the Arapahoe County Department of Human Service, a position she started in May 2017.

20.     Niceta's position as a Caseworker involved with child welfare gave her unique insight into child protection. Her experience meant that she knew exactly what to do and say so that a concern about a child's safety in the custody of a parent could be raised.

21.     Niceta's position also allowed her to attend court hearings, testify at the court hearings, and become familiar with court staff.

22.     Niceta had friendships with Guardian Ad Litems, Aurora Police Department officers, including a romantic relationship with the police chief, Magistrate Judges, and court clerks.

23.     Nichols first met Niceta in person on March 1, 2017, after talking to her on an online dating site for some time. Shortly after that, they initiated a romantic relationship.

24.     After dating for a short period, Niceta and Nichols moved in together.

**B.     Niceta becomes abusive, and Nichols moves out.**

25.     In November 2018, Nichols moved out of Niceta's home because of Niceta's verbal, emotional, and psychological abuse.

26.     During this time, Nichols' home was being rented, and she could not get back into her home until January 1, 2019.

27.     Because her home was being rented, Nichols lived in a hotel room, and M.N. stayed with her Grandmother and Aunt.

28.     Nichols had daily phone calls with M.N. and would see M.N. every weekend.

29.     At the time, Nichols was in therapy for depression. Nichols' therapist advised Nichols to write down her thoughts to deal with the depression and the verbal, emotional, and psychological abuse Niceta imposed on her.

30.     On or about December 10, 2018, Nichols took M.N. to Niceta's home and said she was "done" and returning to her hotel room.

31.     Niceta called the police, and the police went to Nichol's hotel room and found her with a small cut on her wrist. Nichols, a Registered Nurse, knew the cut could not have caused her permanent harm.

32.     Nichols also, acting on advice from therapists, wrote her thoughts on a piece of paper next to her.

33.     When the police came into her hotel room, they found her with a cut on her wrist and a note about what was bothering her next to her.

34.     The police viewed this as a "suicide attempt."

35.     Because of the alleged attempt, Nichols was placed on a mental health hold.

36.     Nichols' mother and M.N.'s grandmother filed for guardianship of M.N. after the incident.

37.     Niceta learned about the filing of the motion from a courthouse clerk and filed an emergency guardianship request six days after Nichols' mother.

**C.     Niceta uses Nichols' love for M.N. to manipulate her.**

38.     The court held a hearing the day after Niceta filed and granted Niceta emergency guardianship over M.N. for sixty days, to end on February 15, 2019.

39.     Nichols did not know of the filing, hearing, or order until after they occurred.

40.     Armed with guardianship over Nichols' child, Niceta threatened Nichols with obtaining permanent custody over M.N. under the Colorado psychological parent laws. These threats were not made for the best interests of M.N. but rather as a tool to control Niceta's relationship with Nichols.

41.     These threats were made so that Nichols would continue to be in a relationship with Niceta. The threats worked, and Nichols and Niceta continued their relationship.

42.     Despite this, on or about August 26, 2019, Niceta followed through with her threats and filed a Petition for Allocation of Parental Responsibilities [APR] to obtain full custody of M.N.

43.     Niceta sought custody of M.N. under Colorado's Psychological Parent Law, C.R.S. § 14-10-123, which allows a non-biological parent to file an APR Petition if they satisfy certain conditions.

44.     In the Petition, Niceta made several false representations, such as Nichols being diagnosed with two separate personality disorders.

45.     Further, Niceta misrepresented Nichols' relationship with M.N. and her mental health struggles.

46.     On August 27, 2019, Nichols and Niceta broke up again.

**D.     Court finds that Niceta was the perpetrator of domestic violence.**

47.     On September 1, 2020, the Court held a hearing in the APR case.

48.     On October 5, 2020, the Court issued its order. In the order, the Court found that:

a.     Niceta established that she has standing as the psychological parent.

b.     Nichols and Niceta's relationship was riddled with acts of domestic violence, with **<u>Niceta as the perpetrator.</u>** [emphasis added].

c.     Nichols would have sole decision-making authority regarding all major decisions for M.N., but Nichols should consult with Niceta on the decisions.

7

d.     Nichols should contact Niceta through www.talkingparents.com [TalkingParents] to get her input on decisions.

e.     Nichols would be the primary residential parent of M.N.

f.     Niceta would have parenting time with M.N. every other weekend and every Wednesday after school/daycare through Thursday morning with timely drop off at school/daycare.

49.     In November 2020, Niceta approached Nichols wanting to reconcile. Nichols agreed but told Niceta that this would be the last time.

50.     On January 10, 2021, Nichols permanently ended the relationship with Niceta and came to Niceta's house to pick up M.N., their animals, and belongings.

**E.     The end becomes the beginning.**

51.     It was 6:00 pm on January 10 and very cold when Nichols arrived at Niceta's house.

52.     M.N. came outside in a dress and a very light jacket. M.N. told Nichols that Niceta would not let her wear anything else, including her winter jacket.

53.     Niceta had placed some of Nichols' property near the front door. Nichols and Niceta had broken up so often that this had become commonplace.

54.     Nichols would have packed up all the belongings, but throughout the on and off again relationship, Niceta refused to allow Nichols to do this.

55.     It was also commonplace for Niceta not to return all of Nichols's property and to refuse to allow Nichols to search through the house for her property.

56.     So, when Niceta put M.N. into the car, Nichols went upstairs to look for more of her and M.N.'s belongings.

57.     Nichols looked for items in plain sight and did not rummage through Niceta's house.

58.     Niceta became angry that Nichols had gone upstairs, so she came to confront Nichols.

59.     When Niceta came upstairs, Nichols showed Niceta a lamp that belonged to her that she found that Niceta had not returned to her. Nichols had also found other items.

60.     Niceta then began to say nasty things to Nichols about their relationship, Nichols' past, and events Niceta knew would be upsetting that occurred when Nichols was 14.

61.     Nichols and Niceta then went downstairs; Nichols bent down to pick up M.N.'s winter jacket.

62.     Niceta ripped the jacket out of Nichols' hands, causing her to fall. Nichols then reached out and grabbed Niceta's shirt to break her fall.

63.     Niceta fell on top of Nichols and would not get off her, so Nichols pushed Niceta to get her off her.

64.     When Nichols finally got Niceta off her, Niceta called down to J.N., Niceta's minor child from a previous relationship, who was in his room and told him to call 911.

65.     Niceta's story was that Nichols went upstairs and around the house ransacking drawers and various other locations; Niceta requested Nichols to leave, and

Nichols refused; during the incident, Niceta placed M.N. into her car seat and told J.N. to lock himself in his room; Nichols found her flip flops on the floor, and when Niceta bent down to get the shoes, Nichols grabbed her shirt, brought Niceta to the ground and scratched and kicked her.

66.     Niceta later testified that Nichols had pulled Niceta down on top of Nichols, and Nichols held her shirt so that she could not get off her.

67.     To get M.N. away from the situation, Nichols left Niceta's house before the police arrived.

68.     Police arrested Nichols at her home later that night.

69.     Nichols was charged with domestic violence, including assault, battery, and injury to property.

70.     In the police report, the officer noted that both Niceta and Nichols admitted to being involved in the altercation and had injuries; the officer had to determine who was the aggressor and decided that it was Nichols based on Niceta's injuries.

71.      Niceta had more scratches on her than Nichols and a torn shirt.

72.     Because Nichols' arrest concerned domestic violence, on January 11, 2021, a protection order was automatically issued preventing Nichols from having any contact with Niceta, except through TalkingParents, to communicate about M.N.

**F.     Niceta doubles down.**

73.     On January 15, 2021, Niceta filed a Verified Emergency Motion to Restrict Respondent's Parenting Time Pursuant to C.R.S. § 14-10-129(4), asking the court to

restrict Nichols' parenting time and only to allow her supervised visitation until the Court could hold a hearing.

74.     On January 18, 2021, the Court granted the emergency order and set a hearing for January 27, 2021.

75.     Under the emergency order, Nichols had limited contact with M.N. and only saw her in Niceta's attorney's office.

76.     On January 26, 2021, Niceta, through her attorney, told Nichols' attorney that Nichols had sent Niceta and her attorney a threatening email in violation of the protective order.

77.     Nichols' attorney made multiple attempts to obtain the email, which Nichols denied sending.

78.     Niceta's attorney would not send the email to him or even tell him what the email said.

79.     At the hearing on January 27, 2021, the parties stipulated that Niceta would preserve the email.

80.     Eventually, the email was produced, and Nichols did not send the email. The email did not have Nichols' name or her email address.

81.     The email, not sent by Nichols, is part of a pattern employed by Niceta to use her knowledge of the Courts and Child Services to smear Nichols to remove M.N. from Nichols' custody unlawfully and to try to get Nichols arrested.

**G.     Adams Family Services accepts Niceta's version of events.**

82.     On January 27, 2021, Niceta and Nichols attended a hearing regarding the emergency motion restricting parenting time.

83.     At the hearing, Niceta's attorney called Annie Schmeckpeper, an Intake Caseworker for Adams Family Services.

84.     Adams Family Services had received the referral because of a conflict of interest with the Arapahoe County Department of Human Services because Niceta is an employee of that department.

85.     An intake Caseworker is the employee that is the first person to respond to referrals received by Adams Family Services.

86.     Once a referral is assigned, the intake Caseworker must finish the assessment within 60 days.

87.     At the time of Ms. Schmeckpeper's testimony, she had not met with Nichols.

88.     Nichols did not know that the case had been referred to the county or Ms. Schmeckpeper until the day of the hearing.

89.     Ms. Schmeckpeper had approximately two weeks to contact Nichols before the hearing but did not make any efforts except for January 14, 2021, when she stopped by Nichols' home before meeting with Niceta at her home. Nichols was not home due to work.

90.     Nichols did not find out that Ms. Schmeckpeper had tried to contact Nichols at her home until after the hearing.

91.     Ms. Schmeckpeper had only met with Niceta, J.N. and M.N.

92.     Ms. Schmeckpeper first met with J.N. alone and left M.N. and Niceta together.

93.     Later Ms. Schmeckpeper interviewed M.N. alone.

94.     Ms. Schmeckpeper testified that M.N. told her that Nichols said that M.N. should tell people that Niceta attacked her.

95.     Ms. Schmeckpeper also testified, based on her interview with Niceta, that Nichols struggled with mental health and that she was not getting treated for it.

96.     Ms. Schmeckpeper testified that she would have concerns about Nichols taking care of M.N. based on the information she heard, the police report, and the statements regarding mental health.

97.     Ms. Schmeckpeper should have taken steps to independently verify any information supplied to her by Niceta about Nichols.

98.     At the time of her testimony, Ms. Schmeckpeper did not know that a Court had found Niceta was the perpetrator of domestic violence.

99.     At the hearing, Niceta testified that Nichols had been evaluated by a doctor and diagnosed with Borderline Personality Disorder [BPD].

100.    At the hearing, Niceta also called Barbara Shindell as an expert witness to talk about BPD and the impacts a parent with BPD would have on their children.

101.    At the time of the hearing, no doctor had evaluated Nichols and diagnosed her with BPD.

102.    After the hearing, the Court restricted Nichols' parenting time until the assessment by Adams Family Services could be completed and set a hearing for 60 days to revisit the issue.

103.    The Court also noted that it was appropriate and necessary for M.N. to have continuing, ongoing, frequent contact with Nichols.

104.    The Court instructed Nichols and Niceta to select an appropriate third party to supervise the visits. The third party did not have to be a facility but could be an individual that both Nichols and Niceta agreed on.

105.    The Court ordered Nichols to have eight hours of parenting time a week.

106.    Further, the Court ordered Nichols would have phone calls with M.N. through the TalkingParents.

107.    The Court ordered Nichols and Niceta to work through TalkingParents to immediately find treatment or therapy for M.N. before the parties returned to Court.

108.    Lastly, the Court set a hearing date for March 24, 2021, at 11:00 am to review the case.

109.    On February 2, 2021, Ms. Schmeckpeper finally met with Nichols at her home.

110.    Nichols and Ms. Schmeckpeper talked about Ms. Schmeckpeper going to Nichols' house to speak with her before going to Niceta's home.

111.    Ms. Schmeckpeper told Nichols that Niceta said that Nichols probably did not answer the door because she worked nights and was probably sleeping.

112.    Nichols told Ms. Schmeckpeper that she had not worked nights in three years, which Niceta knew, and that Niceta had lied to her about Nichols' work schedule.

**H.      Niceta grasps at straws to get Nichols arrested.**

113.    On February 17, 2021, Niceta reported to the police that Nichols harassed her through TalkingParents. The police looked at the messages and could not find a violation of the protective order but kept the case open until they could talk to Nichols.

114.    Concerning third-party supervisors, Nichols had provided Niceta with several names of possible third-party supervisors they could use to have Nichols supervised visits with M.N.

115.    Niceta rejected most names provided by Nichols.

116.    On February 19, 2021, the Court suggested that the parties use a center.

117.    On February 28, 2021, Nichols and Niceta exchanged M.N. at Fat Boys Bar and Grill.

118.    Niceta claimed that during the drop-off, Nichols flipped her off. Niceta called the police, and they investigated but could not find any evidence and inactivated the case.

119.    On March 2, 2021, Nichols and Niceta participated in mediation to try and resolve the third-party supervisor issue. They could not reach an agreement.

120.    On March 7, 2021, Niceta claimed that she found a note in M.N.'s clothes written in crayon saying "Fuck U." M.N. allegedly told Niceta that the note came from mommy, meaning Nichols.

121.    On March 10, 2021, Niceta followed up with the police about the investigation into Nichols, flipping her off, and was upset that nothing had been done.

122.   Niceta also informed them about the note found on March 7.

123.   The police asked Niceta to send them the note, and she refused, saying she had already sent them a copy.

124.   On March 10, 2021, Adams Family Services completed the initial assessment triggered by the incident on January 10, 2021.

125.   Upon information and belief, the assessment found that Nichols was responsible for the child abuse or neglect incident only because the police arrested Nichols and not Niceta for the incident.

126.   Isabella Valdez, an Adams Family Services Caseworker, took over the case after Ms. Schmeckpeper finished her assessment.

127.   As a result of the finding, Nichols' name was entered into the Comprehensive Child Welfare Information System [Trails] as a person responsible for an incident of child abuse or neglect.

**I.     Adams Family Services moves the case to permanency.**

128.   Adams Family Services decided to start a non-court involved case because of Nichols' alleged BPD, "suicide attempts," and January 10, 2021, domestic violence case, and because, according to Adams Family Services, Nichols' was not following through with the treatment plan.

129.   On March 18, 2021, Niceta claimed to find a note in her mailbox written using magazine cutouts saying, "I want you to die…sleep soundly."

16

130.   Niceta claims that Nichols sent her the note, but no evidence of this was found despite the mailbox being attached to the house and monitored by a Ring video camera.

131.   On March 24, 2021, the Court held a hearing to review the restriction of parenting time.

132.   The Court continued the restriction for another month because the parties had not followed the Court's orders.

133.   For example, Nichols did not get eight hours of parenting time each week, the Magistrate had yet to receive the assessment, and Ms. Schmeckpeper did not show up at the hearing.

134.   The Court set a hearing for April.

135.   However, the Court allowed Nichols to spend four hours of M.N.'s birthday with her without supervision on April 2, 2021.

136.   To transition the case from intake assessment to ongoing non-court involvement or permanency, Nichols and Niceta participated separately in Family Team Meetings [FTM].

**J.     Adams Family Services disbelieves everything Nichols says and believes everything Niceta says.**

137.   The purpose of FTMs is to identify child protection concerns and what Adams Family Services would ask Nichols and Niceta to do to mitigate those concerns; this is known as a Family Services Plan. Adams Family Services also uses FTMs to discuss how treatment and the case are going.

17

138.     On April 5, 2021, Nichols had her first FTM. Ms. Schmeckpeper and Ms. Valdez participated in this FTM.

139.     At the first meeting, Ms. Schmeckpeper accused Nichols of coaching M.N.

140.     Even though Nichols had testified in court and told Ms. Schmeckpeper that she did not coach M.N.

141.     Nichols never coached M.N.

142.     At the meeting, Adams Family Services also brought up Nichols' alleged BPD, which Nichols stated she did not think she had.

143.     At the time, Adams Family Services did not have any diagnosis from any doctors that evaluated Nichols and found she had had BPD. Adams Family Services concluded Nichols had BPD based solely on Niceta's communications with it.

144.     Niceta believed Nichols had BPD because, in August 2017, Nichols went to the doctor for a medication check-up.

145.     Later Nichols learned that her medical chart had changed after that meeting. Someone at the doctor's office had checked a box indicating that she had BPD.

146.     Nichols did share with Adams Family Services that her chart might indicate that she had BPD but that this was an error.

147.     This was an error because if a doctor had found she had BPD, the chart would contain clinical reasoning or justification for the new diagnosis.

148.     Nichols also told Adams Family Services that she had an evaluation conducted after the medication check in August 2017, and it did not find that she had BPD.

149.   As part of the mitigation plan, Adams Family Services asked Nichols to participate in domestic violence classes, child protection therapy [CPT] and to get another mental health evaluation.

150.   Adams Family Services did not order Nichols to take any of the above actions because the case was still in the non-court involved phase, but Nichols did have to do them.

151.   Notably, Adams Family Services would not allow Nichols to start the domestic violence classes or the CPT until after the criminal case had closed, one reason was that Adams Family Services wanted to see if Nichols would have to take domestic violence classes as part of the criminal case.

152.   Further, Ms. Valdez would not allow Nichols to start her CPT until she had completed the domestic violence classes.

153.   Nichols could have participated in CPT before finishing the domestic violence classes, but it was Adams Family Services' preference that she completes the domestic violence classes before starting CPT.

154.   Adams Family Services' refusal to allow Nichols to participate in CPT without finishing her domestic violence classes for no reason other than its preference delayed the progress of Nichols' case and ultimately allowed M.N. to remain separated from Nichols for longer than necessary.

**K.    Niceta will not work with Nichols.**

155.   From April 9 - 11, 2021, Niceta refused to drop M.N. off at Red Tent, the supervised visitation center, for Nichols's supervised visitation with M.N.

19

156.    Niceta would not drop M.N. off at Red Tent because she was upset that the facility did not inform her about what happened during the visits.

157.    During this time, Nichols and M.N.'s dog Sam was not doing well, and Nichols was talking to M.N. about what would happen to Sam.

158.    Nichols begged Niceta to approve a parental supervisor so that M.N. could spend time with Sam before he passed.

159.    Niceta would not approve of the supervisor.

160.    On April 21, 2021, the date the Court set in March to review the motion to restrict parenting time, the original Magistrate called in sick.

161.    Because another Magistrate had to hear the case, the parenting restrictions remained.

162.    The Magistrate did require that M.N. and Nichols have nightly Facetime calls with each other.

163.    Niceta made it difficult for Nichols to have the phone calls with M.N. by making M.N. unavailable due to dinner, being busy, sleeping, or other excuses. A pattern Niceta had already started to employ in January.

164.    Further, Nichols' phone calls with M.N. were short, and M.N. appeared distracted by Niceta.

165.    In early May 2021, Nichols started seeing Dr. Parker Wilson for a mental health assessment.

**L.      Nichols is acquitted.**

166.    On May 25 - 26, 2021, Nichols had her trial for the domestic violence incident on January 10, 2021.

167.    A jury acquitted Nichols of all charges.

168.    On that same day, Niceta contacted Nichols about M.N. via TalkingParents, informing her that M.N. would be camping with Niceta's friends without Niceta from May 28 – 31, 2021. Because of this, M.N. could not have parenting time or facetime with Nichols.

169.    In June, Nichols filed a Motion for Contempt regarding Niceta's failure to follow the court's orders regarding Nichols and M.N's time together.

170.    On June 14, 2021, the Court issued a Notice of Hearing for July 7, 2021, to address the reinstatement of Nichols's parenting time and to review the motion to restrict parenting time.

171.    The Court granted the motion for contempt against Niceta and, on June 17, 2022, issued an Order to Show Cause for Niceta to appear in court to explain why she violated the Court's Order on August 19, 2021.

172.    Later in June, Dr. Wilson provided his assessment and diagnosis regarding Nichols' mental health.

173.    Dr. Wilson did not diagnose Nichols with BPD or Bi-Polar, but with Complex-Post Traumatic Stress Disorder.

174.    On June 29, 2021, Ms. Valdez wrote a 90-day review of the case.

175.    Ms. Valdez provided the review to Niceta and her attorney.

176.    Nichols only received a copy of the 90-day review from Niceta's attorney.

**M.    Adams Family Services does not listen to Nichols.**

177.    As evidence of Adams Family Services' failure to listen to Nichols, Ms. Valdez continually claimed that Nichols had Bi-Polar Depression in her reports, even though Nichols regularly told her that Niceta falsely claimed she had Borderline Personality Disorder, not Bi-Polar Depression.

178.    In the review, Ms. Valdez relates that Niceta told her M.N. could not control her bodily functions after supervised parenting time and facetime calls with Nichols.

179.    Niceta had not reported the issue with bodily functions to the supervisors at the parenting time facility.

180.    Ms. Valdez also related that Nichols refused to participate in domestic violence treatment because of her acquittal.

181.    Nichols had only asked Ms. Valdez if she had to continue with the domestic violence classes because she had been acquitted. Nichols never said she would not do the classes.

182.    Ms. Valdez recommended that M.N. remain with Niceta, that Niceta and Nichols participate in the Family Service Plan, that Nichols's visitation with M.N. is supervised until consistent positive parenting reports from visitation coordinators and an Order from the Court, and for the case remain non-court involved if all parties are engaged.

183.   At the time of the recommendation, every parenting report was consistently positive, and Nichols had a mental health evaluation conducted, which was part of her Family Service Plan.

184.   The only aspects of the treatment plan Nichols had not participated in were the domestic violence classes which Nichols could not attend because of her work, and the CPT, which she could not complete until she finished the domestic violence classes.

185.   At the time, Ms. Valdez knew why Nichols had not participated in the domestic violence classes.

186.   On June 30, 2021, Niceta filed an opposed motion to continue the hearing, scheduled for July 7, 2021.

187.   On July 1, 2021, the original Magistrate on the case recused herself from hearing the case any further; upon information and belief, it is because the Magistrate started working with Niceta in her capacity as a Caseworker for the Arapahoe County Department of Human Services.

188.   On July 6, 2021, the Court reassigned the case and continued the evidentiary hearing because the Court already had a full schedule.

189.   On July 6, 2021, Nichols found her own provider for the domestic violence classes that would work with her schedule, and Nichols signed up for the classes.

190.   On July 9, 2021, the Court rescheduled the July 7, 2021, hearing for August 23, 2021.

191.   The hearing could have been conducted earlier, but Niceta refused all earlier dates.

192.     Upon information and belief, Niceta refused the earlier dates because she had already been informed that Adams Family Services would open a Dependency and Neglect case.

193.     On July 12, 2021, Nichols participated in an FTM.

194.     Ms. Valdez's supervisor, Ronda Burgin, was present at the meeting.

195.     Ms. Burgin did not believe Nichols when she informed them that she had been acquitted at trial for the January 10, 2021, incident. Ms. Burgin insisted that the jury was hung and that Nichols could be retried at any time.

196.     On July 19, 2021, Adams Family Services filed a Dependency and Neglect [D&N] case against Niceta and Nichols in Adams County Juvenile court.

197.     Adams Family Services had initially filed the case in Arapahoe County Juvenile Court on July 15, 2021, but dismissed the case because of Niceta's connection to the county.

198.     Notably, the Court held a hearing to dismiss the case from Arapahoe County Juvenile Court, and Jennifer Conn attended.

**N.     Adams Family Services' actions prevent Nichols from getting custody of M.N., allowing M.N. to remain with Niceta.**

199.     Because of the filing of the D&N, the APR hearing did not occur.

200.     At that hearing in early July 2021, Nichols would have had the opportunity to present evidence regarding her parenting abilities and would have obtained custody of M.N.

201.     The filing of the D&N case meant that Nichols would not have that opportunity for months.

202.   On July 22, 2021, a Temporary Protective Custody hearing was held, and the court granted Niceta custody.

203.   Nichols did not testify at the hearing or participate as required by Colorado law.

204.   Also, on July 22, 2021, the Court appointed Jennifer Conn as Guardian Ad Litem [GAL] for M.N.

205.   Ms. Conn had attended the initial hearing in Arapahoe County and Adams County.

206.   Ms. Conn asked the Adams County Court to appoint her as GAL for M.N. because she already had some familiarity with the case.

207.   At the time, Nichols did not know who Ms. Conn was.

208.   In early August, the Court in the Domestic Relations case transferred the case to the Adams County Juvenile Court and vacated all hearings related to the case.

209.   On August 3, 2021, Ms. Conn visited Nichols at her home.

210.   On August 5, 2021, Nichols, via email, asked Ms. Valdez and Ms. Conn why her visits with M.N. were still supervised.

211.   Ms. Conn replied, "In reviewing notes and conversations with the department, it sounds like the reason for supervised visits is because of conversations that have occurred in the past with you and M.N., along with the domestic violence incident."

212.   Nichols asked for clarification on what conversations they were referring to, but neither Ms. Valdez nor Ms. Conn responded.

213.    In addition, Nichols acknowledged that the domestic violence incident occurred but reiterated that both Niceta and Nichols were involved and that Nichols was being punished unfairly for it.

214.    On August 26, 2021, Nichols had a supervised visit with M.N. During the visit, M.N. kept talking to Nichols about a water bottle of M.N.'s that Niceta wanted Nichols to return to her.

**O.    Niceta's lies culminate.**

215.    On August 27, 2021, Niceta had Nichols arrested again for domestic violence.

216.    Niceta alleged that on August 27, 2021, she heard a female voice inside the house and started to wake up.

217.    Allegedly, as Niceta was waking up in bed, she was hit on the right side of the head with an unknown object and lost consciousness; when she woke up, Niceta felt blood on the side of her head.

218.    Niceta would clean up the blood before the police arrived.

219.    After Niceta woke up, she called her current girlfriend, Vanessa Wilson, who was the Police Chief for the APD.

220.    Niceta called Ms. Wilson four times before Ms. Wilson answered.

221.    Allegedly, later Niceta found a ripped-up greeting card in her room and noticed that the necklace she had on when she went to bed was missing.

222.    Ms. Wilson gave the neckless to Niceta as a gift.

223.    Niceta also reported that her throat hurt. Niceta's neck showed red marks.

224.   Allegedly, after the attack, Niceta walked around her house and noticed the back door and garage door were open, which she claimed she shut before she went to bed.

225.   Allegedly, when Niceta was walking around the house, M.N. came out of her room and told Niceta that Nichols was there and that Nichols had talked to M.N. about a water bottle.

226.   When asked by police if someone other than Nichols might have been there, Niceta replied that she did not know.

227.   When asked by police if the only reason she thought Nichols was in her home was because of what M.N. told her, Niceta replied that she did not know.

228.   Before leaving the scene, an officer photographed the bedroom, asked about surveillance footage, and was told that the cameras did not capture the suspect.

229.   Niceta told the officers that she looked at the Ring camera, which did not capture anything because the batteries may be dead.

230.   Niceta had claimed many times over the past year that Nichols was at her house but could never produce any video showing Nichols at the home because the batteries were always dead.

231.   Niceta's negligence in keeping the cameras powered is inconsistent with the actions of a person concerned with someone coming unannounced to her home many times over the past year.

232.   Upon information and belief, the officers did not confirm Niceta's statements about the batteries being dead in her Ring camera.

233.    The police transported Niceta to the University of Colorado Hospital, where a nurse conducted a forensic examination.

234.    The nurse found that Niceta had marks on her neck from strangulation, bruising on her right cheek, and a scratch with dried blood on the right side of her head.

235.    At the time, Niceta did not claim any issues with the hearing.

236.    A CT scan was conducted of Niceta's head which came back normal.

237.    While at the hospital, the officers called Ms. Wilson on Niceta's phone to speak with her about the incident. While speaking with Ms. Wilson, they muted their body cameras.

238.    Later, Ms. Wilson met with the officers after Niceta returned from the hospital.

239.    Ms. Wilson expressed concern about Nichols to the officers and informed them that Nichols was "dangerous."

240.    Upon information and belief, Ms. Wilson called the Assistant District Attorney for Adams County after talking to the officers. She used her position as police chief of APD to influence the Assistant District Attorney to expedite the arrest of Nichols.

241.    Between talking with Ms. Wilson and arresting Nichols, the officers conducted some investigations, such as looking at Niceta's neighbor's cameras to see if they could see Nichols or her car.

242.    None of the cameras showed Nichols or her car. Upon information and belief, the officers failed to investigate the neighbors of Nichols to determine if any video footage existed of her or her vehicle leaving her home.

243.    Nichols' neighbor across the street had a camera that showed Nichols' entire house, including her driveway where her car was parked, but APD did not check that camera.

244.    The APD did check the camera Niceta had above her garage and did not see Nichols.

245.    Later, Nichols learned that officers at the APD were talking about how Ms. Wilson got her current girlfriend's ex-partner arrested, referring to Nichols.

**P.    Niceta gets what she wants.**

246.    On August 27, 2021, APD arrested Nichols and charged her with Domestic Violence, Criminal Attempt, Second Degree Assault, Second Degree Burglary, and Criminal Mischief.

247.    The charges were based on Niceta claiming she recognized Nichols' voice after first claiming not to know who the voice was and Nichols' five-year-old daughter saying that she saw Nichols that evening in her bedroom.

248.    Because of the date of Nichols' arrest, she had to spend the weekend in jail.

249.    In swearing out the affidavit for arrest, the police listed Ms. Wilson as a witness to the events because she spoke with Niceta after the alleged assault. The police did not indicate that Ms. Wilson was the Police Chief of APD at the time.

250.    Upon information and belief, APD was able to get an arrest warrant for Nichols because of Ms. Wilson's undue influence.

251.    Shortly after the incident, APD conducted a forensic interview of M.N. because she was allegedly the only witness to the incident.

29

252.   In the interview, M.N. gave inconsistent statements and indicated that Niceta told her that Nichols was in the house.

253.   On September 10, 2021, Niceta had Nichols arrested for breaking the protection order.

254.   Nichols had used TalkingParents to communicate with Niceta about an issue with M.N. at school.

255.   For the January 10, 2021, domestic violence incident, the court had instructed Nichols to use TalkingParents to communicate about M.N. with Niceta, so she believed it would be okay for her to do so, but it was a violation of the protection order.

256.   After this arrest, Nichols spoke with a member of APD's Fugitive Surveillance and Apprehension Team [FAST] and told him all about what had happened to her in the past months.

257.   The FAST team member shared with Nichols that in all his time with the APD, he has never seen a warrant issued so fast for this type of offense, referring to the August 27, 2021, arrest.

258.   He also shared that, typically, nothing would have happened to Nichols for breaking the protection order, and it must have happened because of Ms. Wilson's involvement.

259.   On September 15, 2021, the parties had one of several pretrial conferences for the D&N case.

260.   At the conference, Nichols' counsel resigned from the case.

**Q.     Everyone gangs up on Nichols.**

261.   At the conference, the pattern of discounting what Nichols says and relying on everything Niceta says was prevalent.

a.     During the pretrial conference, Ms. Conn told the Court that Nichols had committed a huge domestic violence incident. Even though, at the time, Nichols had not been convicted of domestic violence and had been acquitted of the other.

b.     Ms. Conn told the court that Nichols had inappropriate conversations with M.N. during her supervised visits even though nearly all the supervised visits were positive and contained no evidence of Nichols coaching M.N.

c.     Niceta's attorney informed the court that Niceta had permanent hearing loss from the August incident. However, Niceta was treated immediately after the incident, and no hearing loss was found.

262.   Because Nichols had to get another attorney, the court held another pretrial conference on September 29, 2021.

263.   In the conference, Nichols' attorney brought to the court's attention that M.N. had issues with her hygiene while in Niceta's care and the concerns that Niceta had coached M.N.

264.   Visitation notes prepared by supervisors also noted the hygiene issues.

265.   On October 11, 2021, Nichols participated in another FTM.

266.   In the FTM, Nichols reiterated that she did not commit domestic violence in August.

267.   Nichols continuously brought this up in meetings with Adams Family Services personnel and others because they treated her as if she had been convicted of the crime, did not believe her when she said she did not go to Niceta's house on that night in August, and took Niceta's word on this and everything else on face value.

268.   Later in the same meeting, Ms. Valdez mentioned that M.N. felt pulled between Niceta and Nichols and that M.N. had to watch what she said about Nichols in front of Niceta and vice-versa.

269.   Nichols told Ms. Valdez that this could not be true because Nichols and M.N. did not discuss Niceta during the visits.

270.   Nichols also explained to Ms. Valdez that Niceta told M.N. to lie to Nichols.

271.   Nichols knew about this because she caught M.N. in a lie and asked why she was lying. M.N. said it was because Niceta told her to do so because M.N. was not allowed to tell Nichols things.

272.   Ms. Valdez did not take any action on this information.

273.   Further, someone supervised all of Nichols' time with M.N., so if Nichols had commented about Niceta, the person would have noted the comments in the visit notes.

274.   In addition, in the meeting, Ms. Valdez stated that she had concerns before court involvement about Nichols not following the treatment plan, specifically the domestic violence classes.

275.   Nichols again told Ms. Valdez that she could not attend the classes because the only provider Ms. Valdez provided to her only offered the classes during the hours she had to work.

276.   Nichols had told Ms. Valdez that she had recently lost her job, so her work would not interfere with the classes.

277.   Finally, even though Nichols had asked in the past for another provider of domestic violence classes and actually did not need a different provider now, Ms. Valdez provided her with the name of another provider.

278.   Had Ms. Valdez provided this information to Nichols earlier, Nichols would have completed the domestic violence classes much earlier.

279.   Interestingly, Adams Family Services wanted Nichols to attend the domestic violence classes even though she had an active criminal case against her. In the past, Adams Family Services told her that she could not start the domestic violence classes until the criminal charges were dealt with.

280.   Adams Family services also allowed Nichols to start CPT.

**R.    Adams Family Services punts and fails to protect M.N.**

281.   In that same meeting, Ms. Valdez stated that Niceta told her that before M.N. visits with Nichols, M.N. goes to the school nurse complaining about physical anxiety symptoms, that she had wetting accidents at school, and that M.N. showed some concerning feelings and behaviors of anxiety.

282.   Ms. Valdez took Niceta's word that what she said was true, and no person at Adams Family Services, or the GAL, took any steps to contact M.N. 's school to confirm the information.

283.    When Nichols heard this information, she was very concerned, so the next day, on October 12, 2021, she called and spoke with the nurse at M.N.'s school, the school counselor, and M.N.'s teacher.

284.    The school nurse, counselor, and teacher denied allegations of M.N. having symptomatic anxiety at school, wetting, or complaining about physical symptoms.

285.    Later Nichols' attorneys in the D&N case confirmed with M.N. 's teacher that none of the information relayed by Niceta about M.N.'s problems at school was true.

286.    Nichols shared with Ms. Valdez that she had spoken with three people at the school, and all of them denied the allegations.

287.    Nichols refuting the allegations made by Niceta had no impact on Ms. Valdez.

288.    Because despite knowing it was false, Adams Family Services used what Niceta reported as a basis for keeping Nichols away from M.N.

**S.    More evidence showing that M.N. did not know what happened on August 27, 2021.**

289.    On October 22, 2021, in a virtual meeting with her therapist, M.N. told the therapist that Nichols had broken into Niceta's home, hit Niceta with a baseball bat, and put her hands on Niceta. M.N. told the therapist that Nichols had woken her up and that she had witnessed the events.

290.    It is believed that M.N. was referring to the incident that occurred in August 2021.

291.    However, when interviewed three days after the alleged incident, M.N. did not mention a baseball bat or Nichols putting her hands on Niceta.

292.    Further, in the visits after the incident, M.N. had no hesitations or fears about being with Nichols. Indeed, a five-year-old who saw someone hit a person with a baseball bat would be afraid of the person with the baseball bat.

293.    On or about October 2021, Adams Family Services opened an assessment to determine if the incident described by M.N. warranted further action.

294.    Adams Family Services sent a different intake Caseworker to talk with Nichols about the incident.

295.    On November 2, 2021, Nichols spoke with the intake Caseworker.

296.    In the assessment, the intake Caseworker listed every case, concerning Nichols, since 2005 but failed to list that Niceta was involved in a domestic violence case in 2010 and did not indicate that Nichols was acquitted of domestic violence in 2021.

297.    The intake Caseworker also failed to mention that in 2010 a "founded finding" of child abuse/neglect was issued against Niceta.

298.    The investigator listed a traffic ticket that Nichols had in 2005 when she was eighteen years old but failed to list that Niceta had been involved in domestic violence or that a court found Niceta as the perpetrator of domestic violence.

299.    Every assessment that required Adams Family Services to conduct background checks of Nichols or Niceta failed to uncover any of Niceta's issues.

300.    This is another example of how Adams Family Services would give Niceta the benefit of the doubt but would not do the same for Nichols.

301.    Further, the intake Caseworker noted that Niceta worked for the Arapahoe County Department of Human Services.

**T.**     **The truth starts to come out.**

302.    On November 1, 2021, the court conducted another pretrial conference for the D&N case.

303.    At the hearing, Nichols' attorney informed the court that Nichols had not seen M.N. for about a month.

304.    The attorney then provided the court with information from Family Tree-Karlis Center, where the supervised visits were held, indicating that Niceta did everything possible to make any visitation more complicated than it had to be.

305.    The attorney also informed the court that Nichols had serious concerns about M.N. being with Niceta, primarily because of the apparent coaching being done by Niceta, and asked that M.N. be removed from Niceta's home.

306.    Nichols knew that if M.N. was away from Niceta, Adams Family Services could get the truth from M.N. without Niceta's influence, and M.N. would be returned to her care.

307.    On November 23, 2021, Nichols had the preliminary hearing for her criminal trial concerning the events in August 2021.

308.    At the hearing, Nichols' public defender pointed out many deficiencies with APD's investigation into the incident. The public defender noted that APD did not do any of the following common to all investigations:

        a.     call Crime Scene Investigators to process the scene,

        b.     collect the bed sheets for testing,

        c.     swab door handles or anything in the home for fingerprints,

    d.     conduct any DNA testing,

    e.     canvas Nichols neighborhood for camera footage.

309.   While examining an officer, the public defender also highlighted for the court that Nichols was not found on Niceta's cameras or any neighborhood ring cameras from either direction on Niceta's street.

310.   In response to the question about not seeing Nichols on Niceta's garage camera, the officer stated that the camera had blind spots.

311.   When asked if the officer had conducted any tests to determine if the camera had blind spots, the officer admitted that he did not.

312.   At the hearing, another charge was brought against Nichols based on the alleged hearing loss Niceta suffered due to the incident.

313.   The charge was added even though Nichols' attorney pointed out that immediately after the incident, Niceta did not complain about hearing loss, and no evidence was presented connecting the alleged hearing loss to the August 27 incident.

314.   On or about November 27, 2021, Adams Family Services closed the assessment regarding the baseball bat and moved it to the D&N case.

315.   Adams Family Services made a finding of minor neglect/injurious environment against Nichols because M.N. reported that she was "scared."

316.   This was the second finding of neglect against Nichols.

**U.    Some people continue to refuse to see the truth.**

317.   On December 9, 2021, Nichols had another court date for the D&N case.

318.    In that hearing, Ms. Conn leaned into the narrative provided by Niceta and berated Nichols for repeatedly victimizing Niceta and for not taking responsibility for her actions.

319.    On December 31, 2021, Ms. Conn filed a Motion to suspend Nichols's Parenting time with M.N.

320.    As a basis for the motion, the GAL cited the incident on January 10, 2021, for which a jury acquitted Nichols, Nichols' mental health, and the alleged domestic violence in August 2021.

321.    The GAL did not mention (1) that a court had found that Niceta was the perpetrator of domestic violence, (2) that Nichols had been acquitted for the January 10, 2021, incident, and (3) that the only reports about Nichols having issues with mental health came from Niceta.

322.    Further, the GAL relied on reports from Niceta regarding M.N.'s mental and emotional health, such as the anxiety M.N. exhibited at school.

323.    Reports that if the GAL did, any independent investigation would have shown that Niceta was lying to the GAL and Adams Family Services.

324.    In the Motion, Nichols learned for the first time that Niceta had taken M.N. to a psychiatrist and had been put on Zoloft for Post-Traumatic Stress Disorder [PTSD].

325.    A basis for the diagnosis was Niceta falsely claiming that M.N. had witnessed Nichols hitting Niceta with a baseball bat.

326.    Further, Niceta lied to the doctor and told him she had sole decision-making authority over M.N.

327.    The GAL knew about Niceta medicating M.N. and that she did not have sole decision-making authority over M.N., but had no issues with Niceta misrepresenting the problems to the doctor and not informing Nichols of M.N. being on medication.

328.    The GAL also took Niceta and M.N.'s word that M.N. witnessed the incident in August 2021. Even though Nichols denied ever going to Niceta's home that day, Nichols expressed concerns about Niceta coaching M.N., M.N. was five years old and had given conflicting information about what occurred that night.

329.    Moreover, the GAL falsely said that Niceta was the victim of a horrible domestic violence event that now requires her to wear a hearing aid because of the beating.

330.    Upon information and belief, the GAL and Adams Family Services did not independently investigate any information provided in the motion to suspend parenting time and acted with reckless disregard for the truth.

331.    On January 19, 2022, and January 22, 2022, the Court conducted an evidentiary hearing regarding the GAL's motion to suspend parenting time and the disposition regarding the proposed treatment plan for Nichols.

332.    With respect to the treatment plan, Nichols objected to the requirement that she get another mental health evaluation because she had already had a mental health evaluation and had been going to treatment since May 2021.

333.    Nichols further objected to this requirement because the only reason Nichols' mental health was at issue was that Niceta falsely claimed that Nichols had BPD.

334.   The only evidence that Nichols had any issues with mental health came from Niceta; no doctor had ever conducted an evaluation of Nichols to diagnose her with BPD or said she struggled with her mental health to the extent that she could not care for herself or M.N.

335.   Moreover, Nichols had nearly a year's worth of supervised visits showing that she could care for M.N. All visitation reports stated that there were no safety concerns.

336.   Despite this, the Court ordered Nichols to conduct a mental health evaluation.

**V.      The pattern of alienation continues.**

337.   On January 24, 2022, Nichols participated in another FTM. Nichols participated in this FTM with her mother.

338.   At the meeting, Nichols' mother asked Ms. Conn if she could have time with M.N.

339.   Ms. Conn responded that Nichols' mother could not have time with M.N. until Ms. Conn had checked with M.N.'s therapist and that if the therapist approved a visit, Nichols' mother would have to visit with M.N. at Adams Family Services.

340.    In the past, Adams Family Services had allowed M.N. to see the family and friends of Niceta without Nichols' approval and without being vetted by Adams Family Services.

341.   Upon information and belief, the only reason Ms. Conn would not allow Nichols' mother to have unsupervised visits with M.N. was Nichols' disabilities.

342.   Ms. Conn had a distorted view of Nichols' disabilities, which she relied on to discriminate against Nichols and ultimately to discriminate against Nichols' mother.

343.   At the hearing, testimony about M.N.'s issues was presented after visits with Nichols.

344.   Remarkably, the Court understood that the only evidence of emotional problems surrounding visits between M.N. and Nichols came from Niceta and her girlfriend, Vanessa Wilson.

345.   A fact that neither Ms. Valdez nor Ms. Conn could grasp.

346.   At the hearing, Niceta testified that she had video cameras in her house, which showed M.N.'s behavior.

347.   After the hearing, Nichols' attorney asked Niceta's attorney for the footage so Nichols could view it.

348.   Both Niceta and her attorney refused to provide it to Nichols.

349.   Throughout the saga, Niceta engaged in similar actions. She would claim that something happened, claim that she had proof that it happened, but would either refuse to produce it or ultimately would not have it.

350.   Despite all this, Adams Family Services always believed Niceta over Nichols.

351.   On January 28, 2022, the court denied the Motion to suspend Nichols' parenting time.

352.    Even though the Court denied the Motion, the filing of the Motion with false unverified information further delayed the matter. It prevented Nichols from obtaining custody of M.N. sooner than she did.

**W.    Adams Family Services does all it can to prevent Nichols from seeing M.N.**

353.    On February 9, 2022, Nichols was supposed to visit with M.N.

354.    However, before the visit, Ms. Valdez called Nichols and told her that the visit was canceled because M.N. had run away.

355.    Ms. Valdez told Nichols that she could not provide more information then, but Niceta told her she was on the phone with APD.

356.    This information alarmed and concerned Nichols, so she immediately called the APD to ask if she could do anything to help find M.N. and requested that the officers contact her immediately after they found M.N.

357.    The person Nichols spoke with at APD needed clarification because no report had been made about M.N. running away.

358.    Later Nichols received the APD call record for February 9, 2021. The record shows only one call made to the department that day, which was by Nichols.

359.    Another time, Niceta canceled a visit claiming that M.N. wanted to avoid going to the visit.

360.    Niceta claimed that when they were driving to the visit, M.N. unbuckled herself from the backseat, started to hit Niceta while driving, and pulled the steering wheel, which caused Niceta's truck to hit a curb, gave her a flat tire and damaged the axel to her truck.

361.   Niceta shared this information with the therapist and Adams Family Services.

362.   Neither the therapist nor Adams Family Services verified that any of this occurred.

363.   Had Nichols come to them with a similar story, they would have required proof and, even with the evidence, would not have believed her.

364.   These are further examples of Adams Family Services' failure to protect M.N. and Nichols from Niceta's vindictive and malicious lying.

365.   On February 22, 2022, Nichols filed a Forthwith Motion for Parenting Time and a Finding of No Reasonable Efforts against the Adams Family Services.

366.   Adams Family Services, *de facto*, suspended Nichols' parenting time by failing to take any steps to ensure that Nichols had family time with M.N., which violated Nichols's statutory and constitutional rights.

367.   Despite the D&N case, Nichols' parental rights remained intact, including her residual parental rights under the Colorado Children's Code and the constitution, including the right to reasonable parenting time unless restricted by the court. C.R.S. § 19-1-103(119).

368.   Moreover, the Colorado Children's Code's purpose is to preserve and strengthen family ties whenever possible. C.R.S. § 19-1-102(1)(b).

369.   Adams Family Services failed to ensure Nichols had the court-ordered family time with M.N. At the time of the Motion, Adams Family Services owed Nichols 28 hours of family time with M.N.

370.    In the seven months since the D&N case had opened, Nichols had only had 47 hours of family time with M.N.

371.    Further issues were that Adams Family Services requested Nichols participate in therapeutic visitation but could not provide the services, which set Nichols up for failure.

372.    Upon information and belief, the individual selected by Adams Family services to conduct the therapeutic visitations were not even licensed in any state.

373.    Moreover, Adams Family Services and Ms. Conn wanted to suspend Nichols' parenting time even though Adams Family Services had never actually observed Nichols's family time.

374.    And all of Nichols' supervised parenting time with M.N. was positive.

375.    Adams Family Services' failure to provide Nichols with reasonable parenting time harmed the attachment and bond between M.N. and Nichols.

376.    Adams Family Services, through their actions, intended for M.N. to be alienated from Nichols.

377.    The Court denied Nichols' Motion but noted its expectation that Adams Family Services exercise all due diligence in providing parenting time to Nichols as required by statute and the Court's Order of January 28, 2022.

378.    Another reason the Court denied the Motion was that Adams Family Services had represented that it increased Nichols' visitation with M.N. to three hours per week from one and one-half hours per week.

379.   After the Court denied the Motion, Adams Family Services continued to fail to provide Nichols with the appropriate parenting time.

380.   On March 28, 2022, Nichols filed a Motion to Reconsider its Finding Regarding Reasonable Efforts and for Further Parenting Time Orders.

381.   The Motion outlined Adams Family Services' continued failures to ensure Nichols' parenting time with M.N.

**X.      The end is near.**

382.   In early April 2022, the forensic testing on the necklace Nichols allegedly ripped off Niceta on August 27, 2021, came back and found no evidence that Nichols had touched the necklace.

383.   Because of the results of the testing and not having evidence to prove Nichols committed the crime, all charges against Nichols concerning the August 27, 2021, event were dropped in June 2022.

384.   On April 4, 2022, Nichols had another court hearing for the D&N. In this hearing, DHS moved to dismiss the D&N case.

385.   Shortly after, it became apparent that Niceta's claims that Nichols attacked her were not true. Niceta filed a Motion to dismiss Niceta from the D&N Petition, Dismiss the Case[1], and Certify all Child Related Issues to the Pending Domestic Relations Matter from the D&N case.

---

[1] Niceta later filed a Motion withdrawing the Request to Dismiss the case and asking only for her to be dismissed and to grant her intervenor status.

386.    In the Motion, Niceta falsely claims that the August 27, 2021, criminal charges against Nichols were dropped because the District Attorney's Office did not want M.N. to testify.

387.    Niceta did not inform the Court that no evidence that Nichols was in Niceta's home on August 27, 2021, was found, which was why the case would eventually be dropped.

388.    On or about May 12, 2022, a hearing was held in the D&N case. At that hearing, Adams Family Services dismissed the D&N case, and the case was returned to the domestic relations court.

389.    At the hearing, Ms. Conn and others testified that M.N. was doing great and should remain with Niceta.

**Y.     The unsatisfying end.**

390.    Adams Family Services dismissed the case even though not all its alleged concerns about M.N. were addressed, even though Nichols did not finish her entire treatment plan.

391.    Later in May, Nichols learned that M.N. had not been to a therapist since March 17, 2022.

392.    Nichols's lawyer confronted Ms. Conn about this, and Ms. Conn admitted that she did not check to ensure M.N. was seeing a therapist.

393.    Despite this, Ms. Conn testified on May 12, 2022, that M.N. was doing great, without even knowing or checking to see if M.N. had seen a therapist since March 17, 2022.

394.   At that time, Nichols could not check because Ms. Conn had the sole authority concerning M.N.'s medical condition.

395.   Nichols had asked Ms. Conn to keep her informed, which Ms. Conn agreed to; however, Ms. Conn never fully communicated with Nichols about M.N.'s medical care.

**Z.   Adams Family Services makes a different decision regarding a domestic violence incident.**

396.   Later, on or about May 24, 2022, Adams Family Services received a referral from a Federal Bureau of Investigation [FBI] agent about a domestic violence incident between Ms. Wilson and Niceta on December 25, 2021.

397.   The incident occurred when M.N. was in Niceta's custody.

398.   The FBI agent learned about the domestic violence incident when she talked to a Caseworker for the Arapahoe County Department of Human Services who worked with Niceta.

399.   For some reason, the Caseworker did not report the domestic violence incident.

400.   In the interview, the Caseworker noted that things become problematic when Ms. Wilson and Niceta start drinking.

401.   The alleged perpetrator of the domestic violence incident was Ms. Wilson.

402.   The case was assigned to Ms. Schmeckpeper for investigation.

403.   After her investigation, Ms. Schmeckpeper closed the case because Ms. Wilson and Niceta were not living together anymore, so there was no threat to M.N.

404.    Interestingly, Ms. Schmeckpeper found reason to proceed with Nichols' case even though Nichols and Niceta no longer lived together, just like Ms. Wilson and Niceta.

405.    Upon information and belief, the only differences between the Wilson/Niceta incident and the Nichols/Niceta incident were the jobs held by Niceta and Wilson and Nichols' alleged disabilities.

406.    In July 2022, Niceta and Nichols entered a stipulated court-approved plan regarding child support and custody of M.N.

407.    Finally, after almost two years of hell, M.N. was returned to Nichols' custody in July 2022.

### IV.    CLAIMS FOR RELIEF

### FIRST CLAIM
**[14th Amendment -Violation of Procedural Due Process – Familial Association Judicial Deception - Adams County Board of County Commissioners, Adams County Department of Human Services, Division of Children and Family Services, Anne Schmeckpeper, Jennifer Conn]**

408.    Nichols incorporates and restates all allegations previously asserted in this Complaint.

409.    All individual Defendants to this claim, at all relevant times hereto, were acting under color of state law in their capacities for the Adams Family Services and/or as Guardian ad Litem.

410.    At all times in issue, Nichols had a clearly established right under the Fourteenth Amendment to the United States Constitution of freedom of intimate association and familial association.

411.    Nichols's right under the Fourteenth Amendment includes a custodial and a companionship interest in M.N.

412.    In January 2021, M.N. was removed from Nichols' care based partly on testimony and evidence presented by Ms. Schmeckpeper.

413.    In the hearing, Ms. Schmeckpeper testified that Nichols should not have full custody of M.N. because she suffered from untreated mental health issues and that Nichols was the perpetrator of the domestic violence incident.

414.    When Ms. Schmeckpeper made the representations to the Court, she had not spoken with Nichols.

415.    Ms. Schmeckpeper did tell the Court that she had yet to speak to Nichols before giving her testimony.

416.    Ms. Schmeckpeper should have allowed Nichols to respond to the allegations before she testified. *See* 12 CCR 2509-2.7.104.1(C)(10).

417.    Moreover, Ms. Schmeckpeper made representations about Nichols' mental health based on information supplied to her by Niceta, who was seeking custody adverse to Nichols' interests.

418.    Furthermore, Ms. Schmeckpeper testified about Nichols' alleged suicide attempts, which Niceta informed her about.

419.    When she testified, Ms. Schmeckpeper had not spoken to Nichols about the alleged suicide attempts and did not know the facts about the alleged attempts.

420.    At the hearing, Niceta testified that Nichols had BPD.

421.    Further, the Court heard testimony from an expert witness, Barbara Shindell, who had not evaluated Nichols about Nichols having BPD, and the dangers a parent with BPD poses to their children.

422.    The Court restricted Nichols' parenting time with M.N. based on the false and misleading testimony of the witnesses.

423.    Ms. Schmeckpeper and Ms. Schindell misrepresented Nichols' mental health issues to the Court. They did not inform the Court that neither Ms. Schmeckpeper nor Ms. Schindell had a diagnosis from a doctor that evaluated Nichols saying that Nichols had BPD and that her BPD posed a risk to M.N.

424.    Ms. Schmeckpeper knew Niceta supplied the only evidence she had concerning Nichols' mental health.

425.    Ms. Schmeckpeper knew that if she expressed concerns about Nichols' mental health and her ability to care for M.N., the Court would restrict Nichols' parenting time.

426.    Ms. Schmeckpeper acted with reckless disregard when she testified and represented to the court that Nichols' mental health was a concern because she did not have a diagnosis from a doctor that evaluated Nichols and found that she had problems with mental health that would pose a risk to M.N. nor did Ms. Schmeckpeper have reliable evidence of such concerns.

427.    Ms. Schindell, as a mental health expert, knew or should have known that Nichols alleged BPD was not diagnosed by any doctor who had evaluated Nichols and, with such information, misled the court, either intentionally or with reckless disregard, by

providing the court information as to the dangers of a parent with BPD without qualifying such statements that Ms. Schindell had no basis to form a diagnosis or believe that Nichols had BPD independent of Niceta.

428.   The Court restricted Nichols' parenting time with M.N. based on the representations of Ms. Schmeckpeper and Ms. Schindell about Nichols' mental health and its impact on M.N.

429.   Had the Court heard the entire truth, it would not have restricted Nichols' parenting time.

430.   Moreover, Ms. Conn and Adams Family Services filed a Motion with the Court to Restrict Nichols' parenting time with M.N. based on false and unverified information.

431.   The information in the Motion filed by Ms. Conn and Adams Family Services came from Niceta.

432.   Ms. Conn and Adams Family Services, at best, acted recklessly in filing the motion and, at worst, acted intending to harm Nichols and M.N.

433.   Defendants' actions, as described herein, were motivated by malice and/or involved in reckless or callous indifference to Nichols' federally protected rights, and they engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and reckless disregard for Nichols' constitutionally protected rights.

434.   The unlawful acts described were carried out pursuant to the customs, practices, policies, and/or training of Adams County and Adams Family Services.

435.    Defendant Adams County's failure to adequately train and supervise its employees with respect to ensuring they present accurate, verified, and truthful information to the court exhibited deliberate indifference to a known and obvious risk of harm to Nichols and others.

436.    Defendant Adams County has a custom, policy, and practice of accepting, condoning, and ratifying parents' custodial and companionship rights violations.

437.    The acts or omissions of each Defendant, including the unconstitutional custom, policy, and practice described herein, were a legal and proximate cause of Nichols' damages.

438.    In addition, because Defendant Adams County has ratified the misconduct of Defendants Adams Family Services, Ms. Conn, and Ms. Schmeckpeper, their misconduct is chargeable to the county.

439.    As a direct result of the Defendants' unlawful actions described here, Nichols suffered damages.

### SECOND CLAIM
**[42 U.S.C. § 1983 - 14th Amendment -Violation of Substantive Due Process - Familial Association - Adams County Board of County Commissioners, Adams County Department of Human Services, Division of Children and Family Services, Jennifer Conn, Isabella Valdez, Anne Schmeckpeper]**

440.    Nichols hereby incorporates and restates all allegations previously asserted in this Complaint as though fully incorporated herein.

441.    All individual Defendants to this claim, at all relevant times hereto, were acting under color of state law in their capacity as Guardian Ad Litem or as a Caseworker with Adams Family Services.

442.   At all times in issue, Nichols had a clearly established right under the Fourteenth Amendment to the United States Constitution of freedom of intimate association and familial association.

443.   Nichols' right under the Fourteenth Amendment includes a custodial and a companionship interest in M.N.

444.   Nichols' custodial interest provides her with the constitutional right to parent M.N.

445.   Nichols' companionship interest gives her the constitutional right to spend time with M.N.

446.   Defendant's handling of Nichols and M.N.'s case shocks the conscience.

447.   Defendants acted with deliberate indifference to Nichols' companionship rights with M.N. by repeatedly failing to provide her with parenting time.

448.   At one time, Nichols had not seen M.N. for 62 consecutive days.

449.   Over seven months, the Defendants allowed Nichols' visits with M.N. to be canceled for various reasons, often with less than 24 hours notice.

450.   Defendants prevented Nichols from having family time with M.N. for a variety of reasons, such as:

a.      requiring Nichols's family time with M.N. to be therapeutically supervised, despite months of positive visitation reports, but not setting up adequate therapeutically supervised visits for Nichols,

b.      allowing Niceta to cancel family time because J.N. was diagnosed with COVID, even though M.N. was not and went to school on that day,

c.     allowing Niceta to cancel family time because of an anticipated snowstorm,

d.     allowing Niceta to cancel family time because she did not want to have a visit on her birthday,

e.     Adams Family Services closing early because of a snowstorm.

451.   Defendants knew that by canceling Nichols' family time with M.N. and not establishing therapeutically supervised visits for Nichols with M.N., Nichols would not be able to see or spend time with M.N.

452.   Defendants caused and set in motion events that prevented Nichols from spending time with M.N.

453.   Further, Defendants violated Nichols' custodial rights by allowing Niceta to have a doctor prescribe M.N. Zoloft medication without Nichols' knowledge or approval and based on false information.

454.   Furthermore, Ms. Conn regularly represented that M.N. was doing well in Niceta's care and that she should remain in her care because of this.

455.   Ms. Conn based her representations on what Niceta shared with her and M.N.'s actions during the scheduled home visits.

456.   Ms. Conn did not check to ensure that M.N. was going to a therapist or call M.N.'s school to verify the issues Niceta claimed M.N. was having.

457.   Ms. Conn's failure to perform the basic functions of her position prevented Nichols from spending time with M.N. and from making decisions about what was best for M.N.

458.   Defendants' actions, as described herein, were motivated by malice and/or involved in reckless or callous indifference to Nichols' federally protected rights, and they engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and reckless disregard for Nichols' constitutionally protected rights.

459.   The unlawful acts described were carried out pursuant to the customs, practices, policies and/or training of Adams County and Adams Family Services.

460.   Defendant Adams County's failure to adequately train and supervise its officers concerning ensuring parents had family time and the right to determine what medication their children take exhibited deliberate indifference to a known and obvious risk of harm to Nichols and others.

461.   Defendant Adams County has a custom, policy, and practice of accepting, condoning, and ratifying parents' custodial and companionship rights violations.

462.   The acts or omissions of each Defendant, including the unconstitutional custom, policy, and practice described herein, were a legal and proximate cause of Nichols' damages.

463.   In addition, because Defendant Adams County has ratified the misconduct of Defendants Adams Family Services, Ms. Conn, Ms. Valdez, and Ms. Schmeckpeper, their misconduct is chargeable to the county.

464.   As a direct result of the Defendants' unlawful actions described here, Nichols suffered damages.

## THIRD CLAIM
**[4th Amendment -Unreasonable Search – Judicial Deception - City of Aurora, Detective Nathan Moss, Chief of Police Vanessa Williams]**

465.    Nichols hereby incorporates and restates all allegations previously asserted in this Complaint as though fully incorporated herein.

466.    All individual Defendants to this claim, at all relevant times hereto, were acting under color of state law in their capacity as police officers.

467.    At the time of her arrest, Nichols had a clearly established right under the Fourth Amendment to the United States Constitution to be secure in her person against unreasonable arrests.

468.    The right protects Nichols from being arrested based on false material misrepresentations or material omissions made in an arrest warrant to a Court.

469.    Detective Nathaniel Moss swore out an arrest affidavit for Nichols on August 27, 2021.

470.    In the affidavit, Detective Moss did not inform the Court that the only basis for Niceta claiming that Nichols broke into her home was the testimony of M.N. and that Niceta said she did not know when asked if someone else could have broken into her home.

471.    Detective Moss also failed to inform the Court that, at the time, M.N. was five years old.

472.    Detective Moss also failed to inform the Court that no surveillance footage captured Nichols.

473.   Detective Moss also failed to identify that Vanessa Wilson, Niceta's partner at the time, was the Police Chief for the City of Aurora.

474.   Upon information and belief, before swearing out the arrest affidavit, officers had reviewed the camera above Niceta's garage and the cameras of Niceta's neighbors.

475.   Detective Moss did not inform the Court that the camera above Niceta's garage did not capture Nichols and that none of Niceta's neighbor's cameras showed Nichols or her car.

476.   Detective Moss also failed to inform the Court that the decision to seek an arrest warrant for Nichols was made after talking with Ms. Wilson.

477.   Body camera footage shows officers at the hospital talking about calling Ms. Wilson.

478.   After talking about calling Ms. Wilson, the officers turn off the body cameras.

479.   A police officer testified at the preliminary hearing for the August 27, 2021, incident that during that time, officers used Niceta's phone to call Ms. Wilson and did talk with her.

480.   Once the body cameras were turned on again, the officers decided to arrest Nichols.

481.   Upon information and belief, Ms. Wilson used her power as the Police Chief of APD to ensure Nichols was arrested.

482.   Upon information and belief, Ms. Wilson called the Assistant District Attorney for Adams County to ensure Nichols was arrested on August 27, 2021.

483.    Upon information and belief, Ms. Wilson bragged about getting her current girlfriend's ex arrested to other officers in APD.

484.    Officers swore out an arrest warrant for Nichols without having physical evidence that she was at Niceta's home that night, such as fingerprints or DNA, without having Crime Scene Investigators process the scene, without testing the bed sheets, or canvasing Nichols' neighborhood for camera footage.

485.    Upon information and belief, officers would not have sought an arrest warrant based solely on the testimony of M.N., a five-year-old, and Niceta claiming, after she had previously said she did not know who hit her, that she heard Nichols' voice, without the pressure from Ms. Wilson.

486.    Upon information and belief, the Court would not have issued an arrest warrant for Nichols if Detective Moss had informed the Court that (1) officers talked with Ms. Wilson before deciding to arrest Nichols, (2) Ms. Wilson was the Police Chief of APD, (3) that Ms. Wilson was romantically involved with Niceta, (4) Niceta admitted she did not know who was in her home, (5) the camera above Niceta's garage did not show Nichols and that Niceta's neighbors' cameras did not show Nichols, (6) the only reason they assumed Nichols broke into Niceta's home was because of the testimony of M.N., and (7) M.N. was five years old at the time.

487.    Upon information and belief, Ms. Wilson either explicitly or implicitly instructed Detective Moss to leave the above information out of the arrest warrant because she knew it would not be granted if the information was in the arrest warrant.

488.    Defendant's conduct violated clearly established rights belonging to Nichols, which any reasonable law enforcement officer knew or should have known.

489.    Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Nichols' federally protected rights, and they engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating a deliberate indifference to, and a reckless disregard for, Nichols' constitutionally protected rights.

490.    The unlawful acts herein described were carried out pursuant to the customs, practices, policies, and/or training of the Aurora Police Department.

491.    Defendant Aurora has a custom, policy, and practice of accepting, condoning, ratifying, and even encouraging unlawful omitting of important material information in swearing out affidavits for arrest.

492.    Defendant Aurora's failure to adequately train and supervise its officers concerning properly swearing out an affidavit and ensuring they did not omit important material information exhibits a deliberate indifference to a known and obvious risk of harm to Nichols and others.

493.    The acts and omissions of each Defendant, including the unconstitutional custom, policy, and practices described herein, were a legal and proximate cause of Nichols' injuries, damages, and losses.

494.    In addition, because Defendant Aurora has ratified the misconduct of Defendants Moss and Wilson, their misconduct is chargeable to the municipality.

495.    As a direct result of the Defendants' unlawful actions described here, Nichols suffered damages.

### FOURTH CLAIM
**[42 U.S.C. § 12131 - 12134 & 29 U.S.C. § 794 – Public entity disability discrimination – Adams County Department of Human Services, Division of Children and Family Services, Annie Schmeckpeper, Isabella Valdez, Jennifer Conn]**

496.     Nichols incorporates and restates all allegations previously asserted in this Complaint.

497.    At all relevant times, Nichols was a qualified individual with a disability under the ADA because she had a mental impairment that substantially limited one or more major life activities, had a record of such impairment, and/or was regarded as having such impairment by Defendants.

498.    Adams Family Services is a public entity subject to Title II of the ADA because it is a department of a local government. 42 U.S.C. § 12131(1)(B).

499.    Nichols, with or without reasonable accommodations, meets the essential eligibility requirements for receiving services from Adams Family Services.

500.    Although Nichols did not live in Adams County, Adams Family Services had authority over her case because Niceta worked for the Arapahoe County Department of Human Services.

501.    Further, Nichols is the mother of a child who was the subject of a D&N action by Adams Family Services.

502.    Adams Family Services was aware of Nichols's disability.

503.    Adams Family Services discriminated against Nichols because of her actual disability, her depression.

504.    Adams Family Services used Nichols' mental health as a reason not to allow Nichols full supervision over M.N.

505.    Adams Family Services did not have any evidence that Nichols' depression harmed M.N. or posed a risk to M.N.

506.    Adams Family Services relied on Niceta's representations about the severity of Nichols' depression and other disabilities she may or may not have had but did not independently investigate the allegations to ensure they were true.

507.    Adams Family Services, through its conduct, prevented Nichols from having supervised or unsupervised time with her daughter because of her disability.

508.    Adams Family Services, through its conduct, prevented Nichols's mother from having supervised or unsupervised time with M.N. because of her disability.

509.    Adams Family Services did not treat Nichols fairly or similarly to Niceta because of Nichols' disability.

510.    Upon information and belief, Niceta did not suffer from a disability, or Adams Family Services believed she did not suffer from a disability throughout all relevant times at issue.

511.    Adams Family Services gave all benefits to Niceta because she was not disabled and held everything against Nichols because of her disabilities.

512.    As a result of the discrimination, Nichols has suffered damages in an amount to be proved at trial.

**FIFTH CLAIM**
**[Section 1983 - 14th Amendment - Failure to Train - The Adams County Board of County Commissioners and Adams County Department of Human Services, Division of Children and Family Services]**

513.    Nichols hereby incorporates and restates all allegations previously asserted in this Complaint as though fully incorporated herein.

514.    The acts of Adams County and Adams Family Services deprived Nichols of her particular rights under the Fourteenth Amendment of the United States Constitution to custody and companionship with M.N.

515.    Ms. Schmeckpeper and Ms. Valdez acted under the color of state law when they took the actions that violated Nichols' Fourteenth Amendment rights.

516.    The training policies of Adams County and Adams Family Services were inadequate to train its employees to handle the usual and recurring situations they must deal with.

517.    The Colorado Department of Human Services has issued a domestic violence practice guide for child protection services [DV Guide].

518.    In the DV Guide, the Department outlines key areas that Child Protection Services must be aware of and look out for when confronting domestic violence situations.

519.    For example, the DV Guide states that:

a.    Domestic violence perpetrators are often charming, socially appropriate, and able to impress caseworkers with their parenting, simultaneously portraying the adult victim as an awful parent;

b.    Caseworkers should expect perpetrators to attempt to gain support for their opinions or behaviors. Perpetrators often try to establish an aligned relationship

with caseworkers so the caseworker will avoid confronting them or holding them responsible for their behaviors.

        c.      Remember that good co-parenting requires cooperation and mutual support, a willingness to make sacrifices, and putting the needs of children first. Some domestic violence perpetrators dominate their households, control their families, and insist that their own needs come first.

520.   Had Adams County and Adams Family Services properly trained its employees, they would have recognized the facts that showed that Niceta, and not Nichols, was the perpetrator of the domestic violence.

521.   Further, when conducting initial case assessments, Adams County and Adams Family Services are required to conduct a background check on the parties.

522.   Adams County and Adams Family Services regularly failed to conduct background checks on Niceta properly.

523.   Adams County and Adams Family Services did not mention that Niceta was involved in a Protection Order Domestic Abuse Case in 2010 in Arapahoe County.

524.   Adams County and Adams Family Services would have found the case if it had searched the Colorado Courts E-Filing system.

525.   Moreover, when the Aurora Police Department Conducted a Related Event(s) check on Niceta in August of 2021 because of the August 27 incident, it found that Niceta was the subject of a Sex Offense-Fondle Force Child case on October 15, 2020, the subject of a Sex Assault Child Strongarm case on August 31, 2018, and the offender/suspect of a Simple Assault case on December 2, 2011.

526.     Adams County and Adams Family Services did not properly train its employees on assessing a person's mental health and confirming a person's mental health diagnosis before deciding that a person has a specific mental health issue.

527.     Adams County and Adams Family Services employees regularly stated that Nichols suffered either Bi-Polar Depression or BPD.

528.     Adams County and Adams Family Services had no reason to believe that Nichols had Bi-Polar Depression because neither Niceta, Nichols, nor Nichols' doctors told them she had Bi-Polar Depression.

529.     Niceta did tell Adams County and Adams Family Services that Nichols suffered from BPD.

530.     Adams County and Adams Family Services employees regularly repeated the diagnosis as if it was fact, in testimony to the court and in its own assessments and Family Team Meetings.

531.     Moreover, Adams County and Adams Family Services employees sought to suspend Nichols' parenting time with M.N. based on false unverified information.

532.     Adams County and Adams Family Services made a deliberate choice not to adequately train its employees on recognizing the perpetrators of domestic violence, performing proper background checks on the subjects of assessments, and how to confirm a person's diagnosis and not mention it in official documents until it had been confirmed, and not to present false information to the Courts.

533.     The policy not to train employees properly on recognizing domestic violence perpetrators, conducting background checks, confirming mental health issues, and

presenting truthful information to the Courts, amounts to a deliberate indifference to Nichols' constitutional rights protected by the Fourteenth Amendment.

534.    The failures caused Nichols to lose custody of M.N. because Adams County and Adams Family Services made decisions about M.N.'s custody and Nichols' rights over M.N. based on false and incomplete evidence because they consciously ignored evidence to the contrary.

535.    Adams County and Adams Family Services regularly deal with domestic violence incidents, conduct background checks of adults in domestic violence cases involving children, and deal with individuals with mental health issues.

536.    Adams County and Adams Family Services were on actual notice that it needed to train its employees to identify domestic violence perpetrators correctly, conduct background checks on adults, and work with individuals with mental health issues.

537.    Because the duties of employees working for Adams County and Adams Family Services require them to deal with domestic violence, conduct background checks and work with people who have mental health issues, the need for training is so obvious, and the failure to train employees in these areas is likely to result in constitutional violations in these recurring situations.

538.    Moreover, the Adams County and Adams Family Services employees regularly and often present information to the Courts.

539.    A failure to train employees on the above-listed items would result in a constitutional violation because Adams County and Adams Family Services would remove a child from its parent based on false grounds.

540.    Adams County and Adams Family Services' failure to train its employees violated Nichols' Fourteenth Amendment rights because they used the information to remove M.N. from Nichols' custody and maintain the out-of-home placement for M.N.

541.    As a result of Adams County and Adams Family Services' failure to train its employees, Nichols suffered damages in an amount to be proved at trial.

## V.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor, and against each Defendant, for the following relief:

(a)    All declaratory relief and injunctive relief, as appropriate;

(b)    Actual economic damages as established at trial;

(c)    Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

(d)    Punitive damages for all claims as allowed by law in an amount to be determined at trial;

(e)    Pre-judgment and post-judgment interest at the highest lawful rate;

(f)    The maximum tax offset permitted by law;

(g)    Attorney's fees and costs; and

(h)    Such further relief as justice requires and any other relief as allowed by law.

## JURY TRIAL REQUEST

Under Fed.R.Civ.P. 38 (a)(b)(c), and all laws providing for a right to trial by jury, Nichols seeks a jury trial of all claims and issues.

Dated: January 25, 2023,


Respectfully submitted,


 Mitchiner Law, LLC

/s/Thomas H. Mitchiner
Mitchiner Law, LLC
1240 S. Parker Rd. Suite 103
Denver, CO 80231
Telephone: 720.538.0371
Email: tmitchiner@mitchinerlawllc.com


The Law Office of Nathaniel
J. Thompson

/s/ Nathaniel Thompson
The Law Office of Nathaniel
J. Thompson
1240 S. Parker Rd. Suite 103
Denver, CO 80231
Telephone: 720 319 7049
E-mail: nathaniel@njtlaw.net


*Attorneys for Plaintiff Kristin Nichols*

Plaintiff's Address:

17783 East Ada Dr. Aurora, CO 80017