IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-00224-PAB-MEH

KRISTIN NICHOLS, an individual,

      Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF ADAMS,
JENNIFER CONN, individually,
ISABELLA VALDEZ, individually,
ANNE SCHMECKPEPER, individually,
CITY OF AURORA,
DETECTIVE NATHANIEL MOSS, individually, and
POLICE CHIEF VANESSA WILSON, individually,

      Defendants.

---

### ORDER

---

      This matter comes before the Court on Defendant City of Aurora's Motion to Dismiss Plaintiff's Fourth Amended Complaint [ECF 100] [Docket No. 112], Adams County Defendants' Motion to Dismiss Plaintiff's Fourth Amended Complaint [ECF 100] [Docket No. 113], Defendant Moss's Motion to Dismiss [Docket No. 114], Defendant Jennifer Conn's Renewed Motion to Dismiss Plaintiff's Fourth Amended Complaint [Docket No. 115], and Defendant Police Chief Wilson's Motion to Dismiss Plaintiff's Fourth Amended Complaint and Request for Jury Trial (ECF 100) [Docket No. 119]. The Court has jurisdiction pursuant to 20 U.S.C. § 1331.

## I. BACKGROUND[1]

Plaintiff Kristin Nichols is the mother of a minor child, M.N.  Docket No. 100 at 4, ¶¶ 17-18.  From mid-2017 to January 10, 2021, Ms. Nichols was intermittently in a romantic relationship with Robin Niceta, a former caseworker for the Arapahoe County Department of Human Service in the State of Colorado.  *Id.* at 4-5, 7-8, ¶¶ 20, 24-25, 42, 47, 50-51.  During this time period, Ms. Nichols and M.N. sometimes lived with Ms. Niceta.  *Id.* at 5-6, 8, ¶¶ 25-26, 39, 51.  Ms. Niceta subjected Ms. Nichols to "verbal, physical, and psychological abuse."  *Id.* at 5, ¶ 26; *see also id.* at 7, ¶ 49b.

In November 2018, Ms. Nichols moved out of the home she shared with Ms. Niceta and stayed in a hotel room while M.N. stayed with her grandmother and aunt.  *Id.* at 5, ¶¶ 26, 28.  On December 10, 2018, Ms. Nichols "took M.N. to Niceta's home and said she was 'done' and going to her hotel room."  *Id.*, ¶ 31.  Ms. Niceta called the police, who went to Ms. Nichols' hotel room and found her with a "small cut on her wrist," which Ms. Nichols knew "could not have caused her permanent harm," and "a note about what was bothering her next to her."  *Id.* at 5-6, ¶¶ 32, 34.  The police viewed this incident as a suicide attempt.  *Id.* at 6, ¶ 35.  "Because of the alleged attempt, Nichols was placed on a mental health hold."  *Id.*, ¶ 36.  After this incident, Ms. Niceta filed for emergency guardianship over M.N., which was granted.  *Id.*, ¶¶ 38-39.  Ms. Nichols and Ms. Niceta then reconciled and continued their relationship.  *Id.* at 7, ¶ 42.

---

[1] Unless otherwise noted, the facts below are taken from plaintiff's amended complaint ("the complaint") filed on June 26, 2023, Docket No. 100, and are presumed to be true for purposes of ruling on defendants' motions to dismiss.

On August 26, 2019, Ms. Niceta filed a Petition for Allocation of Parental Responsibilities ("APR") to obtain full custody of M.N.[2]  *Id.*, ¶ 43.  Ms. Niceta and Ms. Nichols broke up again the next day.  *Id.*, ¶ 47.  On October 5, 2020 the court issued an order in the APR case in which the court found that "Niceta established that she has standing as the psychological parent."  *Id.*, ¶ 49a.  Under the court order, "Nichols would have sole decision-making authority regarding all major decisions for M.N., but Nichols should consult with Niceta on the decisions," "Nichols would be the primary residential parent of M.N.," and Ms. Niceta would have parenting time with M.N. every other weekend and every Wednesday afternoon through Thursday morning.  *Id.* at 8, ¶¶ 49c., 49e.-49f.  In November 2020, Ms. Nichols and Ms. Niceta reconciled again.  *Id.*, ¶ 50.

On January 10, 2021, Ms. Nichols "permanently ended the relationship with Niceta and came to Niceta's home to pick up M.N., their animals, and belongings."  *Id.*, ¶ 51.  While Ms. Nichols was in Ms. Niceta's home, the following physical altercation ensued:

> Nichols bent down to pick up M.N.'s winter jacket.
> Niceta ripped the jacket out of Nichols' hands, causing her to fall.  Nichols then reached out and grabbed Niceta's shirt to break her fall.
> Niceta fell on top of Nichols and would not get off her, so Nichols pushed Niceta to get her off her.
> When Nichols finally got Niceta off her, Niceta called down to J.N., Niceta's minor child from a previous relationship, who was in his room and told him to call 911.

*Id.* at 9, ¶¶ 62-65.  Ms. Nichols was arrested at her home later that night and charged with domestic violence, including assault, battery, and injury to property.  *Id.* at 10, ¶ 70. "In the police report, the officer noted that both Niceta and Nichols admitted to being

---

[2] The complaint does not state with what court Ms. Niceta filed the petition.

involved in the altercation and had injuries; the officer had to determine who was the aggressor and decided that it was Nichols based on Niceta's injuries."[3]  *Id.*, ¶ 71.  Ms. Nichols' arrest triggered an automatic referral to the Arapahoe County Department of Human Services.  *Id.*, ¶ 74.  The referral was forwarded to the Adams County Department of Human Services, Division of Children and Family Services ("ACDHS") because of Ms. Niceta's connection with the Arapahoe County Department of Human Services.  *Id.* at 10-11, ¶ 74.

On January 18, 2021, a court[4] granted an emergency motion by Ms. Niceta to restrict Ms. Nichols' parenting time, with the result that Ms. Nichols "had limited contact with M.N. and only saw her in Niceta's attorney's office."  *Id.* at 11, ¶¶ 75-77.  The court held a hearing on January 27, 2021 regarding the emergency motion.  *Id.* at 12, ¶ 84.  Annie Schmeckpeper, an intake caseworker for ACDHS, testified at the hearing.  *Id.*, ¶ 85.  At the time of her testimony, Ms. Schmeckpeper had met with Ms. Niceta, M.N., and J.N., but had not met with Ms. Nichols.  *Id.*, ¶ 91.  Ms. Schmeckpeper had attempted to contact Ms. Nichols once before the hearing, but was unsuccessful.  *Id.* at 12-13, ¶¶ 89, 91-93.  Ms. Schmeckpeper testified that: (1) "M.N. told [Ms. Schmeckpeper] that Nichols said that M.N. should tell people that Niceta attacked her;" (2) "based on [Ms. Schmeckpeper's] interview with Niceta, [ ] Nichols struggled with mental health and that she was not getting treated for it;" and (3) Ms. Schmeckpeper "would have concerns about Nichols taking care of M.N. based on the information she heard, the police report, and the statements regarding mental health."  *Id.* at 13, ¶¶ 96-

---

[3] On May 26, 2021, a jury acquitted Ms. Nichols of all charges related to the incident on January 10, 2021.  Docket No. 100 at 21, ¶¶ 172-73.
[4] The complaint does not state what court granted the motion.

98.  Ms. Niceta testified that Ms. Nichols had been diagnosed with Borderline Personality Disorder ("BPD") by a doctor and called an expert witness to discuss BPD and the impacts a parent with BPD would have on her children.  *Id.*, ¶¶ 101-102. However, "[a]t the time of the hearing, no doctor had evaluated Nichols and diagnosed her with BPD."  *Id.* at 14, ¶ 103.  The court "ordered Nichols to have eight hours of parenting time a week," to be supervised by a third party, and set a hearing date for March 24, 2021 to review the case.  *Id.*, ¶¶ 106-07, 111.

On March 10, 2021, Ms. Schmeckpeper completed the initial assessment that had been triggered by the January 10, 2021 incident.  *Id.* at 16, ¶ 131.  The complaint alleges that, "[u]pon information and belief, the assessment found that Nichols was responsible for the . . . incident only because the police arrested Nichols and not Niceta for the incident."  *Id.*, ¶ 132.  After Ms. Schmeckpeper finished the assessment, another ACDHS caseworker, Isabella Valdez, took over the case.  *Id.*, ¶ 133.  On March 24, 2021, the court held a hearing to review the case, and continued the restriction for another month because the parties had not followed the court's orders.  *Id.* at 17, ¶¶ 137-38.  The hearing was set for April 21, 2021.  *Id.* at 20, ¶ 166.

"In April, [ACDHS] decided to start a non-court involved case because of Nichols' alleged BPD, 'suicide attempt,'[5] and January 10, 2021, domestic violence case, and because[ ] of the history of police involvement in the Niceta/Nichols relationship."  *Id.* at 17-18, ¶ 142 (footnote added).  As part of the ongoing non-court involved case, Ms.

---

[5] "Suicide attempt" appears to reference an incident that occurred on December 10, 2018 where police officers encountered Ms. Nichols with a "small cut on her wrist," which Ms. Nichols knew "could not have caused her permanent harm," and "a note about what was bothering her next to her."  Docket No. 100 at 5-6, ¶¶ 31-32, 34.  The police viewed this incident as a suicide attempt.  *Id.* at 6, ¶ 35.

Nichols and Ms. Niceta participated separately in Family Team Meetings ("FTMs").  *Id.* at 18, ¶ 143.  On April 5, 2021, Ms. Nichols had her first FTM with Ms. Schmeckpeper and Ms. Valdez.  *Id.*, ¶ 145.  At this meeting "Ms. Schmeckpeper accused Nichols of coaching M.N." and "[ACDHS] also brought up Nichols' alleged BPD, which Nichols stated she did not think she had."  *Id.*, ¶¶ 146, 149.  "At the time, [ACDHS] did not have any diagnosis from any doctors that evaluated Nichols and found she had had BPD. [ACDHS] concluded Nichols had BPD based solely on Niceta's communications with it." *Id.*, ¶ 150.

On April 21, 2021, the court reviewed the motion to restrict parenting time.  *Id.* at 20, ¶ 166.  The complaint alleges that the presiding Magistrate "made the decision without hearing any testimony or receiving evidence that the parenting restrictions should remain," but does not state what the decision entailed, except that the Magistrate required that M.N. and Ms. Nichols have nightly Facetime calls with each other.  *Id.* at 20-21, ¶¶ 167-68.  In June 2021, Ms. Nichols filed a motion for contempt "regarding Niceta's failure to follow the court's orders regarding Nichols and M.N.'s time together." *Id.*, ¶ 175.  On June 17, 2021,[6] the court granted Ms. Nichols' motion for contempt.  *Id.* at 22, ¶ 177.

On June 29, 2021, Ms. Valdez "wrote a 90-day review of the case."[7]  *Id.*, ¶ 180. Ms. Valdez provided the review to Ms. Niceta and her attorney, but Ms. Nichols "only received a copy of the 90-day review from Niceta's attorney."  *Id.*, ¶¶ 181-82.  In her

---

[6] The complaint states that the court granted the order on June 17, 2022.  Docket No. 100 at 22, ¶ 177.  However, the context in which this allegation appears indicates that the order was granted in 2021.

[7] The complaint does not state whether the case that Ms. Valdez reviewed was the court involved case or the non-court involved case.

review, Ms. Valdez stated that Ms. Niceta told Ms. Valdez that M.N. "could not control her bodily functions after supervised parenting time and facetime calls with Nichols;" and that Ms. Nichols "refused to participate in domestic violence treatment because of her acquittal." *Id.*, ¶¶ 184, 186.  However, Ms. Nichols "never said she would not do the classes," and "Ms. Valdez did not know if Nichols had started the domestic violence classes" at the time of her report.  *Id.* at 23, ¶¶ 187-88.  "Ms. Valdez recommended that M.N. remain with Niceta, that Niceta and Nichols participate in the Family Service Plan, that Nichols's visitation with M.N. is supervised until consistent positive parenting reports from visitation coordinators and an Order from the Court, and for the case remain non-court involved if all parties are engaged."  *Id.*, ¶ 189.

On July 19, 2021, ACDHS filed a Dependency and Neglect ("D&N") case against Ms. Niceta and Ms. Nichols in Adams County Juvenile Court ("Juvenile Court"). *Id.* at 24, ¶ 203.  On July 22, 2021, the Juvenile Court held a Temporary Protective Custody hearing.  *Id.* at 25, ¶ 209.  The Juvenile Court granted Ms. Niceta custody and appointed Jennifer Conn as Guardian Ad Litem ("GAL") for M.N. because she was familiar with the case.  *Id.*, ¶¶ 209, 211, 213.

On August 3, 2021, Ms. Conn visited Ms. Nichols at her home.  *Id.* at 26, ¶ 216. Ms. Conn listened to a difficult conversation between Ms. Nichols and M.N. and praised Ms. Nichols for how she handled it.  *Id.*, ¶¶ 217-18.  On August 5, 2021, Ms. Nichols asked Ms. Valdez and Ms. Conn, via email, why her visits with M.N. were still supervised.  *Id.*, ¶ 219.  Ms. Conn replied that it was "because of conversations that have occurred in the past between you and M.N., along with the domestic violence incident."  *Id.*, ¶ 220.  Ms. Nichols "asked for clarification on what conversations they

were referring to," and "acknowledged that the domestic violence incident occurred but reiterated that both Niceta and Nichols were involved and that Nichols was being punished unfairly for it." *Id.*, ¶¶ 221-22.  Neither Ms. Conn nor Ms. Valdez responded. *Id.*, ¶ 221.

On August 27, 2021 Ms. Nichols was arrested for committing domestic violence against Ms. Niceta.  *Id.* at 27, ¶ 224.  Ms. Niceta claimed that she woke up around 3:30 a.m. that morning because she heard a female voice inside her house and then she was hit on the right side of her head with an unknown object.  *Id.*, ¶¶ 225-26.  Ms. Niceta's neck also showed red marks and she reported that her throat hurt.  *Id.*, ¶ 232. Ms. Niceta called her girlfriend, Vanessa Wilson, who was the Police Chief of the Aurora Police Department ("APD").  *Id.*, ¶ 228.  Ms. Niceta claimed that she walked around her house after the attack and noticed the back door and garage door were open, although they were shut before she went to bed.  *Id.*, ¶ 233.  Ms. Niceta claimed that she later found a ripped-up greeting card in her room and that the necklace she had on when she went to bed was missing.  *Id.*, ¶ 230.  Ms. Niceta claimed that, while she was walking around the house, M.N. came out of her room and told Ms. Niceta that Ms. Nichols was there, and that Ms. Nichols had talked to M.N. about a water bottle.  *Id.* at 28, ¶ 234.

When the police asked if someone other than Ms. Nichols might have been in her home, Ms. Niceta replied that she did not know.  *Id.*, ¶ 235.  When the police asked if "the only reason [Niceta] thought Nichols was in her home was because of what M.N. told her, Niceta replied that she did not know."  *Id.*, ¶ 236.  "Before leaving the scene, an officer photographed the bedroom, asked about surveillance footage, and was told that the cameras did not capture the suspect."  *Id.*, ¶ 237.  "Niceta told the officers that she

looked at the Ring camera,[8] which did not capture anything because the batteries may be dead."  *Id.*, ¶ 238.  The complaint alleges that, "[u]pon information and belief, the officers did not confirm Niceta's statements about the batteries being dead in her Ring camera."  *Id.*, ¶ 241.

The police transported Ms. Niceta to the University of Colorado Hospital, where a nurse conducted a forensic examination, finding that Ms. Niceta had marks on her neck from strangulation, bruising on her right cheek, and a scratch with dried blood on the right side of her head.  *Id.* at 28-29, ¶¶ 242-43.  "While at the hospital, the officers called [Chief] Wilson on Niceta's phone to speak with her about the incident.  While speaking with [Chief] Wilson, they muted their body cameras."  *Id.* at 29, ¶ 246.  "Later, [Chief] Wilson met with the officers after Niceta returned from the hospital."  *Id.*, ¶ 247.  "[Chief] Wilson expressed concern about Nichols to the officers and informed them that Nichols was 'dangerous.'"  *Id.*, ¶ 248.  The complaint alleges that, "[u]pon information and belief, [Chief] Wilson called the Assistant District Attorney for Arapahoe County after talking to the officers.  She used her position as police chief of APD to influence the Assistant District Attorney to expedite the arrest of Nichols."  *Id.*, ¶ 249.  The complaint also alleges that "[u]pon information and belief, APD was able to get an arrest warrant for Nichols because of [Chief] Wilson's undue influence."  *Id.* at 31, ¶ 261.

After speaking with Chief Wilson, "the officers conducted some investigations, such as looking at Niceta's neighbor's cameras to see if they could see Nichols or her car," but "[n]one of the cameras showed Nichols or her car."  *Id.* at 29, ¶¶ 250-51.  The complaint alleges that, "[u]pon information and belief, the officers failed to investigate

---

[8] A "Ring camera" is a home security camera.

the neighbors of Nichols to determine if any video footage existed of her or her vehicle leaving her home." *Id.*, ¶ 251.  Ms. Nichols' neighbor across the street "had a camera that showed Nichols' entire house, including her driveway where her car was parked, but APD did not check that camera." *Id.* at 30, ¶ 252.  APD checked the camera that Ms. Niceta had above her garage and did not see Ms. Nichols.  *Id.*, ¶ 253.  "Months later, Nichols learned that officers at the APD were talking about how [Chief] Wilson got her current girlfriend's ex-partner arrested, referring to Nichols."  *Id.*, ¶ 254.

Detective Nathaniel Moss provided the affidavit for the warrant for Ms. Nichols' arrest.[9]  *Id.* at 60, ¶ 501; Docket No. 114-4.  The affidavit states that two APD officers, Daniel Rubino and Devon Hueckstaedt, responded to Ms. Niceta's 911 call in which she advised that Ms. Nichols "broke into the house, hit her over the head, and left marks on her neck after strangling her."  Docket no. 114-4 at 1.  The affidavit states that, when Officer Rubino interviewed Ms. Niceta at the scene, she "advised that she didn't know

---

[9] Generally, a court should not consider any evidence beyond the pleadings when ruling on a 12(b)(6) motion, *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019), and if the court considers matters outside the complaint, "the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d). However, the Tenth Circuit has recognized a "limited exception" to this rule: the "district court may consider documents referred to in the complaint if the documents are central to the plaintiff' s claim and the parties do not dispute the documents' authenticity." *Waller*, 932 F.3d at 1282; *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (recognizing that "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss"). Detective Moss attached to his motion to dismiss a copy of the affidavit he provided for the warrant for Ms. Nichols' arrest.  Docket No. 114-4.  The arrest warrant is central to Ms. Nichols' claims for unreasonable search, judicial deception, and violation of her right to substantive due process, *see* Docket No. 100 at 60-62, 77-78, 81-82, ¶¶ 501-08, 518-19, 632-36, 640, 665-68, and no party disputes the authenticity of the affidavit attached to Detective Moss's motion to dismiss.  Therefore, the Court will consider the affidavit.

exactly what happened, but prior to calling [911], she heard a female voice inside the house which woke her up." *Id.* at 1-2.  The affidavit identifies Vanessa Wilson as Ms. Niceta's "current partner" and states that Ms. Niceta reported that she called "Vanessa" at 3:16 a.m. on August 27, 2021.  *Id.* at 2.  The affidavit does not state that Vanessa Wilson was the police chief of APD at the time of the incident.  Docket No. 100 at 30, ¶ 260; *see* Docket No. 114-4.

The affidavit states that Ms. Niceta "advised that while she was checking the house, [M.N.] walked out of her bedroom and told [Ms. Niceta] that [Ms. Nichols] was there, and that [M.N.] and her mom talked about [M.N.'s] water bottle."  Docket No. 114-4 at 2.  Ms. Niceta

> told Officer Rubino that she believed [Ms. Nichols] gained entry into the house by use of the garage door remote and back door key that she never returned upon their breaking up.  [Ms. Niceta] was unsure if she had told [Ms. Nichols] the front door code, and also could not remember if she had changed the lock on the back door after she and [Ms. Nichols] broke up.

*Id.* at 2-3.  Officer Rubino also

> briefly spoke with [M.N.].  [M.N.] told Officer Rubino that her mom came and confirmed that she was talking about [Ms. Nichols] when referencing "mom."  [M.N.] advised that she did not know why her mom came and only saw her mom but did not speak to her.  While speaking with Officer Rubino, [M.N.] said that she saw her mom "today" and "I think they were downstairs." [M.N.] confirmed she was talking about [Ms. Niceta and Ms. Nichols ] when she said, "I think they were downstairs."  This concluded Officer Rubino's conversation with [M.N.]

*Id.* at 2.  The affidavit provides M.N.'s date of birth, *id.*, but does not state explicitly that M.N. was five years old.  Officer Rubino transported Ms. Niceta to the University of Colorado Hospital.  *Id.* at 3.  The affidavit states that the nurse who examined Ms. Niceta there "advised [Officer Rubino] that she was told by [Ms. Niceta] that her 'ex-

partner' caused [her] injuries," but that the nurse "did not confirm the name of the ex-partner."  *Id.*  Officer Rubino

> then attempted to call [Ms. Nichols] twice and [Ms. Nichols] did not
> answer.  Officer Rubino then went to [Ms. Nichols'] listed address . . . .
> Officer Rubino advised that he knocked on the door at that address, and
> nobody answered. Your Affiant viewed the portion of body camera video
> from Officer Rubino, and observed a grey Ford Equinox[10] in the driveway
> at the above address when Officer Rubino was there on August 27, 2021
> at 5:09 A.M.

*Id.*  Detective Moss "was later contacted and responded to assist the case" and arrived

at Ms. Niceta's home just before noon on August 27, 2021.  *Id.*  Ms. Niceta allowed

Detective Moss to walk through the house.  *Id.* at 3-5.  Ms. Niceta told Detective Moss

that, when she was woken up by the sound of a woman's voice around 3:00 a.m. on

August 27, 2021, she "recognized the women's [sic] voice" as Ms. Nichols' voice.  *Id.* at

4.  Ms. Niceta told Detective Moss that Ms. Nichols "never returned the garage door

remote or the key to the back door" to Ms. Niceta after the two separated, and that Ms.

Niceta "believed [Ms. Nichols] entered the house that way."  *Id.*  Ms. Niceta told

Detective Moss that, as she walked around the house after she was attacked, M.N.

"walked out of her bedroom and told [Ms. Niceta] 'Mommy was here'" and that she

"talked to 'Mommy' about her water bottle."  *Id.* at 5.

> The affidavit also states that Detective Moss was

> advised by Sergeant Todd Alscher that while speaking with Vanessa, he
> was made aware of the fact that [Ms. Niceta] had [M.N.] staying with a
> friend by the name of Jill Coughland . . . while [Ms. Niceta] was at the
> hospital.  Sgt. Alscher called Jill and spoke with her.  Jill told Sgt. Alscher
> that while on the way home, [M.N.] said "Mommy was there to get a water
> bottle," and that Jill could not recall [ ] what would have caused [M.N.] to
> say that.  Jill also told Sgt. Alsher, later on in the day, she was speaking

---

[10] The affidavit states that Ms. Niceta confirmed that Ms. Nichols drives the same
vehicle.  *Id.* at 5.

with her mother about the assault, and [M.N.] spontaneously said "no, no, mommy was there to get a water bottle."

*Id.*

The complaint alleges that, on August 27, 2021, at about 10:45 p.m., APD arrested Ms. Nichols and charged her with domestic violence, criminal attempt, second degree assault, second degree burglary, and criminal mischief.  Docket No. 100 at 30, ¶ 255.  The charges "were based on Niceta claiming she recognized Nichols' voice after first claiming not to know who the voice was and [M.N.] saying that she saw Nichols that evening in her bedroom."  *Id.*, ¶ 258.  "Shortly after the incident and Nichols' arrest, APD conducted a forensic interview of M.N. because she was allegedly the only witness to the incident."  *Id.* at 31, ¶ 262.  "In the interview, M.N. gave inconsistent statements and indicated that Niceta told her that Nichols was in the house."  *Id.*, ¶ 263.

Ms. Nichols alleges that, at "one of the many pretrial conferences,[11] the pattern of discounting what Nichols says and relying on everything Niceta says was prevalent."  *Id.* at 32, ¶ 272 (footnote added).  During a pretrial conference, Ms. Conn told the court that Ms. Nichols "had committed a huge domestic violence incident[,] [e]ven though, at the time, Nichols had not been convicted of domestic violence;" and that Ms. Nichols "had inappropriate conversations with M.N. during her supervised visits even though nearly all the supervised visits were positive and contained no evidence of Nichols coaching M.N."  *Id.*, ¶¶ 272a.-b.  At another pretrial conference, held on September 29, 2021, Ms. Nichols' attorney "brought to the court's attention that M.N. had issues with

---

[11] The complaint does not provide the date this pretrial conference took place or which case the conference took place in.  However, it appears that the conference was for the D&N case since Ms. Conn was present.  *See* Docket No. 100 at 25, 32, ¶ 211, 272.

her hygiene while in Niceta's care and the concerns that Niceta had coached M.N.," but Ms. Valdez and Ms. Conn testified that M.N. had no issues with her hygiene while in Ms. Niceta's care.  *Id.* at 32-33, ¶¶ 273-74, 276.  However, in a FTM on October 11, 2021, Ms. Valdez told Ms. Nichols that ACDHS was aware of the issues M.N. was having with hygiene.  *Id.* at 33, ¶¶ 277, 280.

During the October 11, 2021 FTM, Ms. Nichols "reiterated that she did not commit domestic violence in August," and she alleges that ACDHS personnel and others "treated her as if she had been convicted of a crime, did not believe her when she said she did not go to Niceta's house on that night in August, and took Niceta's word on this and everything else on face value."  *Id.*, ¶¶ 278-79.  During the meeting, Ms. Valdez "mentioned that M.N. felt pulled between Niceta and Nichols and that M.N. had to watch what she said about Nichols in front of Niceta and vice-versa."  *Id.*, ¶ 282. Ms. Nichols "told Ms. Valdez that M.N. did not have to watch what she said about Niceta in Nichols' presence because Nichols and M.N. did not discuss Niceta during the visits" and that Ms. Niceta told M.N. to lie to Ms. Nichols, but "Ms. Valdez did not take any action on this information."  *Id.* at 34, ¶¶ 283-84, 286.  In addition, "Ms. Valdez stated that Niceta told her that before M.N. visits with Nichols, M.N. goes to the school nurse complaining about physical anxiety symptoms, that she had wetting accidents at school, and that M.N. showed some concerning feelings and behaviors of anxiety."  *Id.* at 35, ¶ 295.  However, Ms. Nichols alleges that "Ms. Valdez took Niceta's word that what she said was true, and no person at [ACDHS], or [Ms. Conn], took any steps to contact M.N.'s school to confirm the information."  *Id.*, ¶ 296.  When Ms. Nichols contacted M.N.'s teacher, the nurse at M.N.'s school, and the school counselor, they "denied

14

allegations of M.N. having symptomatic anxiety at school, wetting, or complaining about physical symptoms."  *Id.* at 36, ¶¶ 300-01.  "Later Nichols' attorneys in the D&N case confirmed with M.N. 's teacher that none of the information relayed by Niceta about M.N.'s problems at school was true."  *Id.*, ¶ 302.  Ms. Nichols "shared with Ms. Valdez that she had spoken with three people at the school, and all of them denied the allegations."  *Id.*, 303.  However, Ms. Nichols alleges that "refuting the allegations made by Niceta had no impact on Ms. Valdez. . . [b]ecause[,] despite knowing it was false[,] [ACDHS] used what Niceta reported as a basis for keeping Nichols away from M.N."  *Id.*, ¶¶ 304-05.

In October 2021, M.N. described an incident to her therapist in which Ms. Nichols broke into Ms. Niceta's house at night, "put her hands on Niceta" and hit Ms. Niceta with a baseball bat.  *Id.*, ¶ 306.  ACDHS "opened an assessment to determine if the incident described by M.N. warranted further action" and "sent a different intake Caseworker[12] to talk with Nichols about the incident."  *Id.* at 37, ¶¶ 310-11 (footnote added).  On November 2, 2021, that caseworker ("Intake Caseworker") spoke with Ms. Nichols.  *Id.*, ¶ 312.  The Intake Caseworker (1) did not indicate Ms. Nichols was acquitted of domestic violence in 2021; (2) failed to list that Ms. Niceta was "involved in a domestic violence case in 2010;" (3) failed to mention that "in 2010[,] a 'founded finding' of child abuse/neglect was issued against Niceta;" but (4) noted that Ms. Niceta worked for the Arapahoe County Department of Human Services; and (5) listed every case concerning Ms. Nichols since 2005, including a traffic ticket.  *Id.*, ¶¶ 313-15, 318.  On November 27, 2021, ACDHS "closed the assessment regarding the baseball bat and moved it to the

---

[12] The complaint does not identify this caseworker.

D&N case," making a finding of "minor neglect/injurious environment against Nichols because M.N. reported that she was 'scared.'"  *Id.* at 39-40, ¶¶ 334-35.

On November 23, 2021, Ms. Nichols had a preliminary hearing for her criminal trial concerning the August 2021 incident.  *Id.* at 38, ¶ 324.  Ms. Nichols' attorney "highlighted for the court that Nichols was not found on Niceta's cameras or any neighborhood ring cameras from either direction on Niceta's street."  *Id.* at 39, ¶ 326. An officer testified that Ms. Niceta's garage camera had blind spots, but admitted that he had not conducted any tests to determine if the camera had blind spots.  *Id.*, ¶¶ 327-28.

On December 9, 2021, Ms. Nichols "had another court date for the D&N case." *Id.* at 40, ¶ 337.  She alleges that, "[i]n that hearing, Ms. Conn leaned into the narrative provided by Niceta and berated Nichols for repeatedly victimizing Niceta and for not taking responsibility for her actions."  *Id.*, ¶ 338.  On December 31, 2021, Ms. Conn filed a motion to suspend Ms. Nichols' parenting time with M.N. based on the incident on January 10, 2021, the incident on August 27, 2021, and Ms. Nichols' mental health.  *Id.*, ¶¶ 339-40.  Ms. Conn's motion "did not mention (1) that a court had found that Niceta was the perpetrator of domestic violence, (2) that Nichols had been acquitted for the January 10, 2021, incident, and (3) that the only reports about Nichols having issues with mental health came from Niceta."  *Id.*, ¶ 341.  Ms. Conn "relied on reports by Niceta regarding M.N.'s mental and emotional health, such as the anxiety M.N. exhibited at school."  *Id.*, ¶ 342.  Ms. Nichols alleges that "independent investigation would have shown that Niceta was lying to [Ms. Conn] and [ACDHS]."  *Id.*, ¶ 343.

Ms. Nichols learned for the first time from Ms. Conn's motion that Ms. Niceta had taken M.N. to a psychiatrist, who prescribed psychiatric medication to M.N. because Ms. Niceta "falsely claim[ed] that M.N. had witnessed Nichols hitting Niceta with a baseball bat." *Id.* at 41, ¶¶ 344-45.  Ms. Nichols alleges that Ms. Niceta "lied to the doctor and told him she had sole decision-making authority over M.N." *Id.*, ¶ 346.  Ms. Nichols alleges that Ms. Conn "knew about Niceta medicating M.N. and that she did not have sole decision-making authority over M.N., but had no issues with Niceta misrepresenting the problems to the doctor and not informing Nichols of M.N. being on medication," "took Niceta and M.N.'s word that M.N. witnessed the incident in August 2021," and "falsely said that Niceta was the victim of a horrible domestic violence event that now requires her to wear a hearing aid." *Id.*, ¶¶ 347-49.  Ms. Nichols alleges that "upon information and belief, [Ms. Conn and ACDHS] did not independently investigate" the information provided in the motion to suspend parenting time. *Id.*, ¶ 350.

On January 19, 2022 and January 22, 2022, the court[13] conducted evidentiary hearings regarding Ms. Conn's motion. *Id.*, ¶ 351.  The court ordered Ms. Nichols to "conduct a mental health evaluation." *Id.* at 42, ¶ 356.  On January 28, 2022, the court denied Ms. Conn's motion. *Id.* at 44, ¶ 371.

On January 24, 2022, Ms. Nichols and her mother participated in another FTM, during which Ms. Nichols' mother requested to "have time with M.N." *Id.* at 43, ¶¶ 365-66.  Ms. Conn denied the request "until Ms. Conn had checked with M.N.'s therapist," stating that, if the therapist approved, Ms. Nichols' mother could "visit with M.N. at [ACDHS]." *Id.*, ¶ 367.  Ms. Nichols alleges that ACDHS "had allowed M.N. to see the

---

[13] The complaint does not state what court held the hearings.

family and friends of Niceta, without being vetted by the therapist, or being supervised," and that, "[u]pon information and belief, the only reason Ms. Conn would not allow Nichols' mother to have unsupervised visits with M.N. was Nichols' disabilities." *Id.*, ¶¶ 368-69.

On February 9, 2022, Ms. Nichols was supposed to visit with M.N., but Ms. Valdez called Ms. Nichols and told her that the visit was cancelled because M.N. had run away. *Id.* at 44, ¶¶ 373-74. "Ms. Valdez told Nichols that she could not provide more information then but that Niceta's attorney had told Ms. Valdez that Niceta was on the phone with APD." *Id.*, ¶ 375. However, no report of M.N. running away had been made to APD. *Id.*, ¶¶ 377-78. On another occasion, Ms. Niceta cancelled a visit claiming that M.N. wanted to avoid it and had interfered with Ms. Niceta's driving in order to do so. *Id.* at 44-45, ¶¶ 379-80. Ms. Nichols alleges that ACDHS did not verify that this had occurred. *Id.* at 45, ¶ 382. Ms. Nichols alleges that these two incidents are "examples of [ACDHS's] failure to protect M.N. and Nichols from Niceta's vindictive and malicious lying." *Id.*, ¶ 384.

On February 22, 2022, Ms. Nichols filed a Forthwith Motion for Parenting Time and a Finding of No Reasonable Efforts against ACDHS.[14] *Id.*, ¶ 385. Ms. Nichols alleges that ACDHS "failed to ensure Nichols had the court-ordered family time with M.N." and "owed Nichols 28 hours of family time with M.N." at the time Ms. Nichols filed the motion. *Id.* at 46, ¶ 389. "In the seven months since the D&N case had opened, Nichols had only had 47 hours of family time with M.N." *Id.*, ¶ 390. The court[15] denied

---

[14] The complaint does not state in which case Ms. Nichols filed this motion.
[15] The complaint does not state what court denied the motion.

the motion, "but noted its expectation that [ACDHS] exercise all due diligence in providing parenting time to Nichols as required by statute and the Court's Order of January 28, 2022." *Id.* at 47, ¶ 397.

On April 4, 2022, there was another hearing in the D&N case. *Id.* at 48, ¶ 409. The complaint states that "[i]n this hearing, DHS moved to dismiss the D&N case." *Id.* On May 12, 2022, there was another hearing in the D&N case, during which ACDHS dismissed the D&N case. *Id.* at 49, ¶ 413. At this hearing, "Ms. Conn and others testified that M.N. was doing great and should remain with Niceta." *Id.*, ¶ 416. The complaint alleges that Ms. Conn gave this testimony "without even knowing or checking to see if M.N. had seen a therapist since March 17, 2022." *Id.*, ¶ 420. The complaint also alleges that, although Ms. Conn had agreed to "keep [Ms. Nichols] informed," Ms. Conn "never fully communicated with Nichols about M.N.'s therapy and emotional health." *Id.* at 50, ¶ 422.

On May 24, 2022, ACDHS "received a referral from a Federal Bureau of Investigation [("FBI")] agent about a domestic violence incident between [Chief] Wilson and Niceta on December 25, 2021" in which Chief Wilson was the alleged perpetrator. *Id.*, ¶¶ 423, 428. The case was assigned to Ms. Schmeckpeper for investigation. *Id.*, ¶ 429. "After her investigation, Ms. Schmeckpeper closed the case because [Chief] Wilson and Niceta were not living together anymore." *Id.*, ¶ 430. The complaint alleges that, "[u]pon information and belief, the only differences between the Wilson/Niceta incident and the Nichols/Niceta incident were the jobs held by Niceta and [Chief] Wilson, Nichols' alleged disabilities, and Niceta having Nichols arrested." *Id.* at 51, ¶ 432.

In June 2022, all charges against Ms. Nichols concerning the incident on August 27, 2021 were dropped.  *Id.* at 47, ¶ 403.  In July 2022, Ms. Niceta and Ms. Nichols "entered a stipulated court-approved plan regarding child support and custody of M.N." *Id.* at 51, ¶ 433.  In July 2022, M.N. was returned to Ms. Nichols' custody.  *Id.*, ¶ 434.

Ms. Nichols filed this case on January 25, 2023.  Docket No. 1.  The complaint names seven defendants: the Board of County Commissioners of the County of Adams ("the Board"), Ms. Conn, Ms. Valdez, Ms. Schmeckpeper, the City of Aurora ("Aurora"), Detective Moss, and Chief Wilson.  Docket No. 100.  She alleges that defendants have violated the U.S. Constitution, Colorado Constitution, Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, and Rehabilitation Act ("RA"), 29 U.S.C. § 794.  *Id.* at 51-82, ¶¶ 435-673.  Ms. Nichols brings the following claims:

> **First Claim:** Fourteenth Amendment[16]- violation of procedural due process- familial association judicial deception against the Board, Ms. Schmeckpeper, Ms. Valdez, and Ms. Conn;
>
> **Second Claim:** Fourteenth Amendment - violation of substantive due process- familial association against the Board, Ms. Schmeckpeper, Ms. Valdez, and Ms. Conn;
>
> **Third Claim:** 4th Amendment - unreasonable search, judicial deception against Aurora, Detective Moss, and Chief Wilson;[17]
>
> **Fourth Claim:** 42 U.S.C. §§ 12131-12134 and 29 U.S.C. § 794 - Public entity disability discrimination against the Board, Ms. Schmeckpeper, Ms. Valdez, and Ms. Conn;

---

[16] The complaint does not state that Ms. Nichols' first and third claims are brought pursuant to 42 U.S.C. § 1983, Docket No. 100 at 51, 59, but the Court construes them as § 1983 claims.

[17] The complaint states that this claim is brought against "Chief of Police Vanessa Williams."  Docket No. 100 at 59.  Because Vanessa Williams is not a defendant in this case and the allegations associated with this claim refer to Chief of Police Vanessa Wilson, *see, e.g., id.* at 60, ¶ 505, the Court construes this claim as being brought against Chief Wilson.

**Fifth Claim:** Fourteenth Amendment - failure to train against the Board;

**Sixth Claim:** Fourteenth Amendment - substantive due process against Aurora and Chief Wilson;

**Seventh Claim:** Colo. Const. Art. 2, § 7 - judicial deception against Detective Moss and Chief Wilson; and

**Eighth Claim:** Colo. Const. Art. 2. § 25 - substantive due process against Chief Wilson.

*Id.*

All of the defendants have moved to dismiss Ms. Nichols' claims against them.[18] Docket Nos. 112, 113, 114, 115, 119.  Ms. Nichols responded to each motion.  Docket Nos. 120, 121, 122, 123, 124.  The defendants replied.  Docket Nos. 125, 126, 127, 128, 130.

## II. LEGAL STANDARD

### A.  Motion to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must "accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff."  *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007).  However, if a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then the plaintiff has not

---

[18] Aurora, Detective Moss, Ms. Conn, and Chief Wilson filed separate motions to dismiss.  Docket Nos. 112, 114, 115, 119.  The Board, Ms. Schmeckeper, and Ms. Valdez ("the County Defendants") filed a joint motion.  Docket No. 113.

stated a plausible claim.  *Id.* at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alterations omitted).

### B.  Qualified Immunity

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard.  *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'"  *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)).  When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or

statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.

## III.  ANALYSIS

The Court will discuss Ms. Nichols' allegations concerning each defendant separately except for the allegations against Ms. Schmeckpeper and Ms. Valdez, which the Court will discuss together.

### A.  Detective Moss

Ms. Nichols brings two claims against Detective Moss: claim three, unreasonable search and judicial deception in violation of the Fourth Amendment of the U.S. Constitution; and claim seven, judicial deception in violation of Article II, § 7 of the Colorado Constitution.  Docket No. 100 at 59-63, 74-79, ¶¶ 497-527, 608-643.  Ms. Nichols bases both of these claims against Detective Moss on her allegation that he omitted material information from the affidavit he provided for Ms. Nichols' arrest.  *Id.* at 60-62, 77-79, ¶¶ 501-508, 518, 634-36, 641-43.

#### 1.  Fourth Amendment Claim

Detective Moss asserts qualified immunity as to Ms. Nichols' Fourth Amendment claim against him.  Docket No. 114 at 3.  When ruling on whether a defendant is entitled to qualified immunity, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in

light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.  The Court will first consider whether the complaint plausibly alleges a constitutional violation.

Ms. Nichols' third cause of action consists of a Fourth Amendment claim for unreasonable search and for judicial deception.  Docket No. 100 at 59-63, ¶¶ 497-527. The complaint bases both of these claims against Detective Moss on the allegation that he omitted material information from his affidavit for Ms. Nichols' arrest.  *Id.* at 60-62, ¶¶ 500-508, 518-19.  In *Franks v. Delaware*, 438 U.S. 154, 171 (1978), the Supreme Court held that an affiant seeking an arrest warrant violates the Fourth Amendment when he knowingly, or with reckless disregard for the truth, omits information which, if included, would prevent the warrant from lawfully issuing.  The Tenth Circuit has held that a plaintiff bringing a *Franks* claim based on omission must plausibly allege two elements: (1) "the omitted information was 'material' in that its inclusion would have vitiated probable cause for issuing the warrant;" and (2) the defendant "acted with the requisite mental state . . . in omitting the information."  *Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020) (citing *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015); *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014); *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)).

The complaint plausibly alleges that Detective Moss omitted the following information from the warrant: (1) that Ms. Niceta "said she did not know when asked if someone else could have broken into her home;" (2) that Vanessa Wilson was the Police Chief for the City of Aurora; and (3) that no surveillance footage captured Ms. Nichols or her car, including footage from the camera above Ms. Niceta's garage and

Ms. Niceta's neighbors' cameras.[19]   Docket No. 100 at 60, ¶¶ 502, 504-05, 507.

Detective Moss argues that the complaint fails to state a *Franks* claim because the

alleged omissions were not material and the complaint does not plausibly allege that

Detective Moss acted recklessly.   Docket No. 114 at 7-11.

To evaluate the first *Franks* element, materiality, the Tenth Circuit has held that a

court must determine "whether a warrant would issue in a 'but-for world where the

attesting officer faithfully represented the facts.'"   *Kapinski*, 964 F.3d at 905 (quoting

*Herrera*, 782 F.3d at 575).   The court makes this assessment by "(1) removing any false

information from the affidavit, (2) including any omitted material information, and then

(3) inquiring whether the modified affidavit establishes [or negates] probable cause for

the warrant."   *Id.* (quoting *Puller v. Baca*, 781 F.3d 1190, 1197 (10th Cir. 2015)).   Where

---

[19] Ms. Nichols alleges that Detective Moss "did not inform the Court that the only basis for Niceta claiming that Nichols broke into her home was the testimony of M.N." Docket No. 100 at 60, ¶ 502.   However, the statement that M.N.'s testimony was the only basis for Ms. Niceta's claim is a conclusory allegation, not information that Detective Moss omitted.   Furthermore, it is contradicted by other allegations in the complaint.   The complaint alleges that, "[w]hen asked by the police if the only reason she thought Nichols was in her home was because of what M.N. told her, Niceta replied that she did not know," and that the charges were partly based on Ms. Niceta "claiming she recognized Nichols' voice."   *Id.* at 28, 30, 62, ¶¶ 236, 258, 517.   Accordingly, the Court will not consider Ms. Nichols' argument that Detective Moss violated the Fourth Amendment by failing to state in his affidavit that "the only basis for Niceta claiming that Nichols broke into her home was the testimony of M.N."   In addition, Ms. Nichols alleges that Detective Moss "failed to inform the Court that, at the time, M.N. was five years old, (but he did list her birthday)."   *Id.* at 60, ¶ 503.   Because the affidavit includes M.N.'s date of birth, Docket No. 114-4 at 2, Detective Moss did not fail to include M.N.'s age in the affidavit.   Ms. Nichols further alleges that Detective Moss "failed to inform the Court that the decision to seek an arrest warrant for Nichols was made after talking with [Chief] Wilson."   *Id.* at 61, ¶ 508.   However, the affidavit states that Sergeant Todd Alscher spoke with "Vanessa."   Docket No. 114-4 at 5.   Therefore, Detective Moss did not fail to inform the court that the decision to arrest Ms. Nichols was made after talking with Chief Wilson.

a plaintiff does not allege any explicit misrepresentations, the court begins with the second step. *Id.*

The affidavit, as submitted by Detective Moss, contains the following information: (1) at 3:23 a.m. on August 27, 2021, Ms. Niceta called 911 and advised that Ms. Nichols had broken into her house, hit her in the head, and left marks on her neck after strangling her; (2) Ms. Nichols was Ms. Niceta's former partner; (3) Ms. Niceta told Officer Rubino that she located a ripped-up greeting card in her room and that a necklace she was wearing when she went to bed was missing; (4) Ms. Niceta's current partner, Vanessa Wilson, had given Ms. Niceta the card and necklace; (5) the ripped up greeting card and necklace were on the floor when Detective Moss walked through Ms. Niceta's house; (6) after she was attacked, Ms. Niceta called Vanessa Wilson, the Aurora Police Department, and the Aurora Fire Department; (7) Ms. Niceta told Officer Rubino that she heard a female voice inside the house that woke her up before she was hit and strangled and later told Detective Moss that she recognized the voice as belonging to Ms. Nichols; (8) M.N. told Ms. Niceta, Officer Rubino, and Jill Coughland that Ms. Nichols had been in Ms. Niceta's house at the time of the assault; (9) a nurse determined that Ms. Niceta's injuries were consistent with being hit in the head and strangled; (10) Ms. Niceta told Officer Rubino and Detective Moss that Ms. Nichols did not return the garage door remote or back door key after Ms. Nichols and Ms. Niceta separated; (11) Ms. Niceta told Officer Rubino and Detective Moss that the back door and garage door were open after she was attacked, although they had been closed when she went to bed; (12) Ms. Niceta told Detective Moss that she was unsure as to whether the back door and garage door were locked when she went to bed; (13) the

house did not show any signs of damage which would indicate forced entry; and (14) Ms. Nichols did not answer the telephone when Officer Rubino called her or answer the door when Officer Rubino went to her listed address around 5:00 a.m. on August 27, 2021, although her car was in the driveway.  Docket No. 114-4 at 1-5.

The complaint alleges that Detective Moss omitted following information from the affidavit: (1) Ms. Niceta said that she did not know if someone other than Ms. Nichols could have broken in to her home; (2) Vanessa Wilson was the Chief of Police for the City of Aurora; (3) no surveillance footage captured images of Ms. Nichols or her car at Ms. Niceta's house, including footage from the camera above Ms. Niceta's garage and Ms. Niceta's neighbors' cameras.  Docket No. 100 at 60, ¶¶ 502, 504-05, 507.

In *Kapinski*, the Tenth Circuit noted that probable cause "is not a precise quantum of evidence" and does not "require the suspect to be more likely guilty than not."  *Kapinski*, 964 F.3d at 907 (citing *Stonecipher*, 759 F.3d at 1141).  "Instead, the question is whether 'a substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion.'"  *Id.* (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)).  Thus, in order to state the first element of a *Franks* claim, the complaint must plausibly allege that the information that Detective Moss omitted from the affidavit would have shown that there was no substantial probability that Ms. Nichols committed the crime.  *See id.* at 905 (citation omitted).

Ms. Nichols argues that Detective Moss' failure to state that Vanessa Wilson was the Chief of Police was material because, "if the judge knew about her involvement, the judge would not have issued the warrant because the evidence relied on would not have been reasonably trustworthy."  Docket No. 123 at 7-8.  She argues that, if alerted

to the fact of Chief Wilson's occupation, the judge would have reason to believe that Chief Wilson "had ulterior motives for her involvement . . . which would lead the information from her, and perhaps even from Niceta, to be untrustworthy." *Id.* at 8. Thus, Ms. Nichols appears to argue that the fact that Chief Wilson was the Chief of Police would have vitiated probable cause because it would have rendered Ms. Niceta's testimony untrustworthy.

As Ms. Nichols points out, *id.*, "law enforcement officers are entitled to rely on information supplied by the victim of a crime, absent some indication the information is not reasonably trustworthy or reliable." *United States v. Wallace*, 550 F.3d 729, 734 (8th Cir. 2008). However, Ms. Nichols cites no support for the premise that a crime victim's romantic involvement with a high-ranking law enforcement officer renders the victim's information untrustworthy or unreliable. Rather, had this information been included, it would not have established probable cause in combination with the other facts in the affidavit. Therefore, Ms. Nichols' allegation that Detective Moss omitted the fact that Vanessa Wilson was the Chief of Police fails to satisfy the first element of a *Franks* claim since it would not have vitiated probable cause. The Court finds that Ms. Nichols has not plausibly alleged that Detective Moss violated the Fourth Amendment by omitting this fact from his affidavit.

Ms. Nichols argues that "the fact that officers checked Niceta's and Niceta's neighbors' cameras for evidence and did not find Nichols is material to a finding of probable cause" and that including this fact in the affidavit "would have vitiated probable cause because it is evidence that Nichols was not at Niceta's home that night." Docket No. 123 at 10. However, when viewed in light of the other information that was

contained in Detective Moss's affidavit—that Ms. Niceta reported recognizing Ms. Nichols' voice, that M.N. stated that she saw Ms. Nichols in the house that night, that Ms. Nichols had a key to the back door and garage door of the house, and that there was no sign of forced entry—the fact that Ms. Nichols was not visible on surveillance footage does not render the probability that Ms. Nichols committed the crime less than substantial.  *See Kapinski*, 964 F.3d at 907 (probable cause exists if there is a substantial probability that the suspect committed the crime).

Moreover, Ms. Nichols fails to allege facts that support the second *Franks* element, knowledge or recklessness, with regard to this omission.  In order to satisfy this element, "there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations."  *Kapinski*, 964 F.3d at 908 (quoting *Stonecipher*, 759 F.3d at 1142).  "A reviewing judge may infer recklessness from 'circumstances evincing obvious reasons to doubt the veracity of the allegations,'" but this "is not a mandatory or automatic inference."  *Id.* (quoting *Beard*, 24 F.3d at 116).  In addition, "the egregiousness of an omission may, in some circumstances, lead to an inference of recklessness."  *Id.* (citing *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990)).

Ms. Nichols fails to allege that Detective Moss knowingly or recklessly omitted the fact that Ms. Nichols did not appear on any security footage from his affidavit.  The complaint alleges that, "[u]pon information and belief, before swearing out the arrest affidavit, officers had reviewed the camera above Niceta's garage and the cameras of Niceta's neighbors," and that none of the cameras showed Ms. Nichols or her car. Docket No. 100 at 29, 60, ¶¶ 251, 506; *see also id.* at 28-30, ¶¶ 237, 249, 253.

However, the complaint does not state which officers are alleged to have viewed the surveillance footage.  Moreover, the complaint does not state that Detective Moss viewed the surveillance footage or that any of the unnamed officers who allegedly viewed the footage informed Detective Moss that Ms. Nichols and her car were not captured by the surveillance cameras.[20]  Because the complaint fails to allege that Detective Moss knew that Ms. Nichols did not appear on any security footage, it fails to allege that he knowingly or recklessly omitted this information.  *See Bruning v. Pixler*, 949 F.2d 352, 357 n.4 (10th Cir. 1991) (noting that the principle that recklessness may be inferred if an officer omits facts that are clearly critical to a finding of probable cause "assumes that the affiant was aware of such omitted facts.").  Therefore, the Court finds that the complaint does not plausibly allege that Detective Moss violated the Fourth Amendment by omitting from his affidavit the fact that Ms. Nichols and her car did not appear on surveillance footage.

Ms. Nichols does not explain why including Ms. Niceta's statement that she did not know if someone other than Ms. Nichols could have broken into her home would vitiate probable cause for issuing the warrant or why Detective Moss was reckless in

---

[20] Ms. Nichols argues that the Court can "impute the other Officers' knowledge to [Detective] Moss in the same manner that the collective knowledge doctrine allows the Court to impute the knowledge of one officer regarding probable cause to another officer."  Docket No. 123 at 14 n.8.  However, collective knowledge doctrine applies in the context of searches and seizures.  *See United States v. Pickel*, 863 F.3d 1240, 1249 (10th Cir. 2017) ("Under the collective knowledge doctrine, the officer who makes a stop or conducts a search need not have reasonable suspicion or probable cause.  Instead, the reasonable suspicion or probable cause of one officer can be imputed to the acting officer.").  Ms. Nichols has cited no legal authority for the proposition that the collective knowledge doctrine permits a court to impute another officer's knowledge to a defendant that plaintiff is trying to hold individually liable under § 1983 for his personal acts.

omitting this information from his affidavit.  However, Detective Moss points out that he noted inconsistencies in Ms. Niceta's statement in the affidavit since he "expressly identified the disparity between what Ms. Niceta had stated to him, compared to what she had previously told Officer Rubino."  Docket No. 114 at 6.  In light of the other information included in the affidavit and the fact that Detective Moss expressly identified inconsistencies in Ms. Niceta's statement, the inclusion of an additional inconsistency, namely, that Ms. Niceta claimed to know it was Ms. Nichols who broke into her home, but also stated that she did not know if someone other than Ms. Nichols could have broken into her home, would not have vitiated probable cause.  Therefore, Ms. Nichols' allegation that Detective Moss omitted this additional inconsistency from his affidavit fails to satisfy the first element of a *Franks* claim, since it would not have vitiated probable cause.  The Court finds that Ms. Nichols has not plausibly alleged that Detective Moss violated the Fourth Amendment by omitting this information from his affidavit.

For the foregoing reasons, the Court finds that the complaint fails to plausibly allege that Detective Moss violated Ms. Nichols' Fourth Amendment rights and that Detective Moss is therefore entitled to qualified immunity.  The Court will dismiss Ms. Nichols' third claim against Detective Moss with prejudice.

### 2.  Colorado Constitutional Claim

In a case where a plaintiff brings both federal and state law claims, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Smith v. City of Enid ex rel. Enid City Comm'n*, 149

F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."); 28 U.S.C. § 1367(c)(3) (permitting a district court to decline supplemental jurisdiction over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction").

In the Tenth Circuit, when "the district court has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3), courts must dismiss pendent state law claims without prejudice "absent compelling reasons to the contrary."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (reversing the district court's grant of summary judgment on state law claims), *abrogated on other grounds by Torres v. Madrid*, 141. S. Ct. 989 (2021)); *Endris v. Sheridan Cnty. Police Dep't*, 415 F. App'x 34, 36 (10th Cir. 2011) (unpublished) ("any state-law claims for assault and battery or mental and emotional injury were inappropriate subjects for the exercise of pendent jurisdiction where all federal claims had been dismissed.") (footnote omitted).  Because the Court will dismiss Ms. Nichols' federal claims, it declines to exercise jurisdiction over her state claims.

### B.  Chief Wilson

Ms. Nichols brings four claims against Chief Wilson: claim three, unreasonable search and judicial deception in violation of the Fourth Amendment of the U.S. Constitution; claim six, violation of substantive due process under the Fourteenth Amendment of the U.S. Constitution; claim seven, judicial deception in violation of Article 2, section 7 of the Colorado Constitution; and claim eight, Art. 2. § 25- violation of

substantive due process under Article 2, section 25 of the Colorado Constitution. Docket No. 100 at 59-63, 70-82, ¶¶ 497-527, 575-673.

### 1. Fourth Amendment Claim

Chief Wilson asserts a qualified immunity defense to Ms. Nichols' Fourth Amendment claim against her. Docket No. 119 at 7. When ruling on whether a defendant is entitled to qualified immunity, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236. The Court will first consider whether the complaint plausibly alleges a constitutional violation.

Ms. Nichols bases her judicial deception claim against Chief Wilson on her allegation that, "[u]pon information and belief, [Chief] Wilson either explicitly or implicitly instructed Detective Moss . . . to leave . . . information out of the arrest warrant because she knew it would not be granted if the information was in the arrest warrant." Docket No. 100 at 62, ¶ 519. The complaint fails to plausibly allege a constitutional violation based on this allegation for two reasons. First, the allegation is conclusory. Second, as discussed above, the complaint fails to plausibly allege that Detective Moss's omissions from the arrest warrant affidavit violated the Fourth Amendment. Therefore, even if the complaint plausibly alleged that Chief Wilson instructed Detective Moss to omit information, the complaint would still fail to plausibly allege that Chief Wilson violated the Fourth Amendment because the omissions were not unconstitutional.

Ms. Nichols also alleges that Chief Wilson violated the Fourth Amendment's protection against unreasonable search because Chief Wilson took steps to "ensure

Nichols was arrested." *Id.* at 61-62, ¶¶ 510-17.  The complaint alleges that, while talking with Ms. Niceta at the hospital, an officer muted his body camera and spoke to Chief Wilson using Ms. Niceta's cell phone and "started to take steps to arrest Nichols" after the body cameras were unmuted.  *Id.* at 61, ¶¶ 510-12.  The complaint also alleges that Chief Wilson pressured officers to seek an arrest warrant.  *Id.* at 62, ¶ 517.  As noted earlier, the warrant for Ms. Nichols' arrest was supported by probable cause. Because it is not a violation of the Fourth Amendment to seek a warrant when there is probable cause, *see* U.S. Const. amend. IV, the complaint does not plausibly allege that Chief Wilson violated the Fourth Amendment by pressuring officers to seek an arrest warrant against Ms. Nichols.

The complaint also alleges that Chief Wilson "called the Assistant District Attorney for Arapahoe County to ensure Nichols was arrested on August 27, 2021." Docket No. 100 at 61, ¶ 514.  The complaint does not specify whether Chief Wilson placed this call before or after the warrant for Ms. Nichols' arrest was issued, but in either scenario, the complaint fails to allege a constitutional violation.  Insofar as the complaint alleges that Chief Wilson called the Assistant District Attorney before the warrant was issued and therefore influenced the Assistant District Attorney to seek a warrant, it fails to state a constitutional claim for the reason discussed above, namely, that seeking an arrest warrant based on probable cause does not violate the Fourth Amendment.  *See* U.S. Const. amend. IV.  Insofar as the complaint alleges that Chief Wilson called the Assistant District Attorney to ensure that Ms. Nichols was arrested after the warrant was issued, it fails to state a claim because there is no Fourth

Amendment right not to be arrested pursuant to a warrant that is supported by probable cause. [21] *See id.*

For the foregoing reasons, the Court finds that the complaint fails to plausibly allege that Chief Wilson violated Ms. Nichols' Fourth Amendment rights and that Chief Wilson is therefore entitled to qualified immunity. The Court will dismiss Ms. Nichols' third claim against Chief Wilson with prejudice.

### 2. Fourteenth Amendment Claim

Ms. Nichols bases her claim that Chief Wilson violated her substantive due process rights under the Fourteenth Amendment on much the same alleged conduct underlying her Fourth Amendment claims. The complaint alleges that Chief Wilson (1) participated in the investigation of Ms. Niceta's assault; (2) was listed as a witness to the events of August 27, 2021; (3) "called the Assistant District Attorney for Arapahoe County to ensure Nichols was arrested;" and (4) discussed the investigation with officers while the officers had their body cameras muted. Docket No. 100 at 71-72, ¶¶ 584, 591, 593. Thus, Ms. Nichols' substantive due process claim is based on factual allegations concerning Chief Wilson's involvement in the decision to investigate and arrest Ms. Nichols for the assault on Ms. Niceta. Ms. Nichols argues that the "Fourteenth Amendment's Due Process clause requires impartiality when judges, prosecutors, and police officers enforce the law," and that her complaint states a claim

---

[21] Ms. Nichols' response states that her "unreasonable search claim is based on judicial deception. The search was unreasonable because the warrant was secured through judicial deception i.e., but for the judicial deception, the warrant would not have been issued." Docket No. 124 at 8 n.2. However, this argument fails because, as discussed above, Ms. Nichols fails to allege that the warrant was secured through judicial deception.

that Chief Wilson "violated [Ms. Nichols'] Fourteenth Amendment rights [sic] to be free from arbitrary exercises of government power."  Docket No. 124 at 10-11.

The Supreme Court has held that, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'"  *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (holding that plaintiff could not bring a substantive due process claim based on an alleged pretrial deprivation of liberty cognizable under the Fourth Amendment) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  The factual allegations underpinning Ms. Nichols' substantive due process claim concern Chief Wilson's involvement in the investigation of the incident on August 27, 2021 and the resulting arrest of Ms. Nichols.  Docket No. 100 at 70-72, ¶¶ 579, 584, 594, 597.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and further states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Thus, the Fourth Amendment constitutes an explicit textual source of protection against Chief Wilson's alleged actions related to the investigation and arrest, and Ms. Nichols may not bring a Fourteenth Amendment claim based on these allegations.  *See McRoberts v. Rosas*, 2022 WL 4482481, at *10-11 (D. Kan. 2022) (dismissing plaintiff's substantive due process claims based on her alleged unlawful arrest and detention because they fell under the Fourth Amendment's explicit textual protection); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194,

1203 (10th Cir. 2003).  The Court will therefore dismiss Ms. Nichols' sixth claim against Chief Wilson with prejudice. [22]

### 3.  Colorado Constitutional Claims

As discussed above, the Court declines to exercise jurisdiction over Ms. Nichols' state law claims.  Accordingly, it will dismiss Ms. Nichols' seventh and eighth claims against Chief Wilson.

### C.  Aurora

Ms. Nichols brings two claims against Aurora in claim three—unreasonable search and judicial deception in violation of the Fourth Amendment of the U.S. Constitution; and one claim in claim six—violation of substantive due process under the Fourteenth Amendment of the U.S. Constitution.  Docket No. 100 at 59-63, 70-74, ¶¶ 497-527, 575-607.

### 1.  Municipal liability

Aurora argues that the Court should dismiss Ms. Nichols' claims against it because the complaint fails to plausibly allege municipal liability.  Docket No. 112 at 2. A plaintiff states a claim against a municipality pursuant to § 1983 if she plausibly alleges that (1) a municipal employee committed a constitutional violation; and (2) a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  Here, the complaint fails to allege that Detective Moss or Chief Wilson committed a constitutional violation. Therefore, Ms. Nichols fails to state a claim for municipal liability against Aurora

---

[22] An additional grounds for dismissal of this claim is that, as the Court has discussed above, the complaint does not plausibly allege that Chief Wilson violated Ms. Nichols' rights under the Fourth Amendment.

because the complaint does not plausibly allege that municipal employees committed a constitutional violation.  The Court will dismiss Ms. Nichols' third and sixth claims against Aurora with prejudice.

### D.  Ms. Conn

Ms. Nichols brings three claims against Ms. Conn: claim one, denial of procedural due process under the Fourteenth Amendment; claim two, denial of substantive due process under the Fourteenth Amendment; and claim four, public entity discrimination in violation of the ADA and RA.  Docket No. 100 at 51-59, 63-65, ¶¶ 435-496, 528-545.

### 1.  Fourteenth Amendment Claims

Ms. Conn argues that Ms. Nichols' first and second claims against her should be dismissed because a GAL does not act under color of state law for purposes of § 1983 liability.  Docket No. 115 at 6-7.  The Tenth Circuit has held that, to "state a valid cause of action under § 1983, a plaintiff must allege . . . the defendant was acting under color of state law."  *Garcia v. Lemaster,* 439 F.3d 1215, 1217 (10th Cir. 2006) (quoting *Doe v. Bagan,* 41 F.3d 571, 573-74 (10th Cir. 1994)).  Therefore, Ms. Nichols may maintain her first and second causes of action against Ms. Conn only if the complaint plausibly alleges that Ms. Conn acted under color of state law.

Ms. Nichols argues that "the Court should find that Conn acted under the color of state law because Conn received her power over M.N. from the state, Conn misused the power she received from the state, M.N. was in Conn's custody under state law, and Conn and [the Board] acted together."  Docket No. 120 at 8.  Ms. Nichols cites legal authority supporting the general principles that: (1) "a defendant in a Section 1983 suit

38

acts under the color of state law when he abuses the position given to him by the State,"
*id.* at 4 (citing *West v. Atkins*, 487 U.S. 42, 49-50 (1988)), and (2) "one who performs a
custodial function pursuant to state law falls within the scope of Section 1983, and a
guardian has custody of their ward."  *Id.* at 7 (citing *Thomas S. v. Morrow*, 781 F.2d 367,
377 (4th Cir. 1986); *Polk Cnty. v. Dodson*, 454 U.S. 312, 320 (1981)).  However, Ms.
Nichols cites no legal authority holding that a GAL is a state actor for purposes of
§ 1983.

There is Tenth Circuit precedent holding that a GAL is not a state actor for
purposes of § 1983 liability because a GAL acts in the interest of the minor she
represents, not the state**.**  *See, e.g., Meeker v. Kercher*, 782 F.2d 153, 155 (10th Cir.
1986) ("We hold that a guardian ad litem is not acting under color of state law for
purposes of § 1983."); *Bolin v. Chavez*, 24 F. App'x 936, 940 (10th Cir. 2001)
(unpublished) (holding that a GAL was not acting under color of state law and therefore
could not be sued under § 1983 since there was "nothing in the record that in any way
suggests that [the GAL] was acting on behalf of the State of Colorado"); *Hennelly v. Flor
de Maria Oliva*, 237 F. App'x 318, 320 (10th Cir. 2007) (unpublished) (holding that the
district court "correctly noted that we have held the [GALs] are not state actors for
purposes of § 1983, because they give their 'undivided loyalty to the minor, not the
state'") (citation omitted); *Morkel v. Davis*, 513 F. App'x 724, 730 (10th Cir. 2013)
(unpublished) (holding that GAL was not subject to suit under § 1983 because GALs are
not state actors for purposes of § 1983).  In light of this precedent, the Court finds that
Ms. Nichols may not maintain her constitutional claims against Ms. Conn because, as a

GAL, Ms. Conn is not a state actor for purposes of § 1983.  Therefore, the Court will dismiss Ms. Nichols' first and second claims against Ms. Conn with prejudice.

### 2. ADA and RA Claims

Ms. Conn argues that Ms. Nichols' fourth claim against her should be dismissed because an ADA or RA claim cannot be asserted against an individual.  Docket No. 115 at 7-9.  Ms. Nichols does not dispute this argument and does not oppose dismissing this claim against Ms. Conn.  Docket No. 120 at 2 n.1.  Therefore, the Court will dismiss Ms. Nichols' fourth claim against Ms. Conn with prejudice.[23]

### E.  Ms. Schmeckpeper and Ms. Valdez

Ms. Nichols brings three claims against Ms. Schmeckpeper and Ms. Valdez: claim one, denial of procedural due process under the Fourteenth Amendment; claim two, denial of substantive due process under the Fourteenth Amendment; and claim four, public entity discrimination in violation of the ADA and RA.  Docket No. 100 at 51-59, 63-65, ¶¶ 435-496, 528-545.

Ms. Nichols alleges that, in the January 2021 hearing concerning Ms. Niceta's emergency motion to restrict Ms. Nichols' parenting time, Ms. Schmeckpeper "testified that Nichols should not have full custody of M.N. because she suffered from untreated mental health issues and that Nichols was the perpetrator of the domestic violence incident."  *Id.* at 12, 52, ¶¶ 84-85, 440.  Ms. Schmeckpeper also testified that she had not spoken to Ms. Nichols.  *Id.* at 52, ¶ 442.  Ms. Nichols alleges that the court restricted

---

[23] The Court will dismiss this claim with prejudice because, as the Court discusses below, ADA claims and RA claims may not be maintained against individuals.

Ms. Nichols' parenting time with M.N. based, in part, on Ms. Schmeckpeper's testimony concerning Ms. Nichols' mental health.  *Id.*, at 54, ¶ 455.

Ms. Nichols alleges that Ms. Valdez "represented to the Court"[24] that (1) "M.N. is reported to have had significant behavioral concerns that appear before or after the days of supervised visitation between M.N. and Nichols;" (2) "the behaviors included anxiety, increased attachment to Niceta, bathroom issues such as soiling herself, trouble sleeping with night terrors, and loss of interest in activities she used to enjoy;" (3) "M.N.'s teacher reported M.N. having problems following directions and being kind to her classmates;" and (4) "M.N.'s pediatrician believed the bathroom accidents were a trauma response."  *Id.* at 54-55, ¶¶ 460-63.  Ms. Nichols alleges that Ms. Valdez lacked "documentation or support" for her representation concerning M.N.'s pediatrician.  *Id.* at 55, ¶ 463.  Ms. Nichols also alleges that defendants "repeatedly fail[ed] to provide her with parenting time."  *Id.* at 57, ¶ 479.

### 1.  Fourteenth Amendment Claims

The County Defendants argue that Ms. Schmeckpeper and Ms. Valdez are entitled to qualified immunity as to Ms. Nichols' Fourteenth Amendment claims.  Docket No. 113 at 5.  When ruling on whether a defendant is entitled to qualified immunity, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case."  *Pearson*, 555 U.S. at 236.  Here, the Court will first consider whether Ms. Nichols has demonstrated that the Fourteenth Amendment

---

[24] The complaint does not state how or to what court Ms. Valdez made these representations.

rights that she alleges Ms. Schmeckpeper and Ms. Valdez violated were clearly established at the time of the alleged violation.

A constitutional right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Surat v. Klamser*, 52 F.4th 1261, 1276 (10th Cir. 2022).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Torres v. Madrid*, 60 F.4th 596, 603 (10th Cir. 2023); *see also Irizarry v. Yehia*, 38 F.4th 1282, 1293 (10th Cir. 2022).  The relevant precedent is "considered on point if it involves *materially similar conduct* or applies with *obvious clarit*y to the conduct at issue."  *Yehia*, 38 F.4th at 1294; *see also Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022).  "To be clear, we do not require plaintiffs to engage in a scavenger hunt for a prior case with identical facts. We ask whether the existing law provides fair warning to a defendant."  *Shepherd*, 55 F.4th at 815 (citations omitted).

Ms. Nichols argues that Tenth Circuit cases decided before the time of the alleged violations "stand for the principals [sic] that if a social worker is going to remove a child from the parent's custody, the social worker must investigate and report information that would disqualify an individual from getting custody and that a social worker cannot rely on misrepresentations and omitted facts when removing a child from the parental home."  Docket No. 121 at 13.  Ms. Nichols cites two cases: *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001), and *Malik v. Arapahoe Cnty. Dept. of Soc. Servs.*, 191 F.3d 1306 (10th Cir. 1999).  *Id.* at 12-13.

42

In *Currier*,[25] the representatives of two minor children, who were abused by their father, brought suit against defendant social workers alleging that the social workers violated the children's substantive due process rights under the Fourteenth Amendment when they "affirmatively removed [the children] from the custody of their mother and then placed them in the custody of their abusive father."  242 F.3d at 908, 917.  The Tenth Circuit characterized plaintiffs' claim as a "'danger creation' cause of action" because the plaintiffs sought to hold state officials liable for the acts of a third party on the basis that the officials 'created the danger' that caused the harm.  *Id.* at 917-19.  Accordingly, the court's analysis was focused on whether plaintiffs plausibly alleged that each defendant created the danger that resulted in the children's abuse at the hands of their father.  *Id.* at 919-23.

*Currier* is distinguishable from this case because Ms. Nichols' substantive due process claim is not a danger creation cause of action.  Ms. Nichols does not claim that Ms. Schmeckpeper and Ms. Valdez created a danger that allowed a third party to harm Ms. Nichols.  Instead, Ms. Nichols's complaint alleges that the defendants violated her right to companionship with M.N. because defendants "repeatedly fail[ed] to provide [Ms. Nichols] with parenting time" and "prevented Nichols from having family time with M.N."  Docket No. 100 at 57, ¶¶ 479, 482.  Moreover, the plaintiffs in *Currier* did not

---

[25] Ms. Nichols also references *Ford v. Johnson*, 899 F. Supp. 227 (W.D. Pa. 1995), stating that the Tenth Circuit's opinion in *Currier* "approved of the decision in *Ford v. Johnson*."  Docket No. 121 at 12 (citing *Currier*, 242 F.3d at 918).  However, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Torres*, 60 F.4th at 603 (citation omitted).  Accordingly, a single decision from the Western District of Pennsylvania cannot demonstrate that the claimed right is clearly established.

bring a procedural due process claim, so *Currier* cannot satisfy the clearly established prong as to Ms. Nichols' procedural due process claim.  Therefore, *Currier* does not clearly establish that the alleged conduct by Ms. Schmeckpeper and Ms. Valdez violated Ms. Nichols' substantive or procedural due process rights under the Fourteenth Amendment.

In *Malik*, the plaintiff alleged that a police officer and a social worker investigating a suspected child pornography case involving Ms. Malik's daughter retaliated against Ms. Malik by having her daughter taken into the custody of social services in violation of the First, Fourth, and Fourteenth Amendments.[26]  *Malik*, 191 F.3d at 1309-13.  The district court rejected the defendants' qualified immunity defense, finding that the defendants used "distortion, misrepresentation[,] and omission" to "mislead[ ] the magistrate judge into issuing the ex parte seizure order despite knowing [the child] was in no imminent danger."  *Id.* at 1313, 1316 (citations omitted).  The Tenth Circuit reviewed the district court's finding that the defendants' conduct violated clearly established law and concluded that "[o]fficials cannot reasonably assume that the law permits them to obtain a custody order in retaliation for a parent's retaining counsel and through reckless omission of probative facts to a magistrate."  *Id.* at 1315-16.

*Malik* is distinguishable from this case for three reasons.  First, the Tenth Circuit's holding that "government officials' procurement through distortion, misrepresentation and omission of a court order to seize a child is a violation of the Fourth Amendment," *id.* at 1316 (quotations and citations omitted), is irrelevant to Ms. Nichols' claims against

---

[26] The Tenth Circuit did not specify whether Ms. Malik's Fourteenth Amendment due process claim alleged a violation of substantive due process or procedural due process.

Ms. Schmeckpeper and Ms. Valdez because Ms. Nichols brings her claims under the Fourteenth Amendment.  *See* Docket No. 100 at 51-59, ¶¶ 435-496.

Second, concerning Ms. Malik's Fourteenth Amendment claim, the Tenth Circuit held that it was clearly established that, "except in extraordinary circumstances, a parent has a liberty interest in familial association . . . that cannot be violated without adequate pre-deprivation procedures."  *Malik*, 191 F.3d at 1315 (citations omitted).  The *Malik* court held that "[a]n ex parte hearing based on misrepresentation and omission does not constitute notice and an opportunity to be heard."  *Id.* (citation omitted).  The Tenth Circuit further noted that the district court had found that "defendants did not believe that the child faced such danger to warrant seeking temporary custody in an ex parte proceeding" and held that "[o]fficials' desire to circumvent an attorney's attempt to negotiate protective conditions for an interview does not rise to the level of an extraordinary circumstance dangerous to the child, and does not allow deprivation of a parent's rights without notice and an opportunity to be heard."  *Id.*  Ms. Nichols alleges that it was Ms. Niceta, not Ms. Schmeckpeper and Ms. Valdez, who filed the emergency motion to restrict Ms. Nichols' parenting time.  Docket No. 100 at 11, ¶ 75.  Ms. Nichols also alleges that she was present at the January 27, 2021 hearing regarding the emergency motion where Ms. Schmeckpeper testified.  *Id.* at 12, ¶¶ 84-85.  Ms. Nichols does not allege that Ms. Schmeckpeper or Ms. Valdez did not believe that Ms. Nichols' parenting time should be restricted.  Thus, *Malik* is distinguishable because it concerned an ex parte hearing initiated by the defendants based on improper motives.

Third, Ms. Nichols' allegations that Ms. Schmeckpeper and Ms. Valdez misrepresented or omitted facts do not describe the kind of misrepresentation and

omission that the *Malik* defendants engaged in.  *See Malik*, 191 F.3d at 1316.  Ms. Nichols alleges that Ms. Schmeckpeper "testified that Nichols should not have full custody of M.N. because she suffered from untreated mental health issues" and that she "made representations about Nichols' mental health based on information supplied to her by Niceta."[27]  Docket No. 100 at 52, ¶¶ 440, 444.  However, Ms. Nichols also alleges that "Ms. Schmeckpeper did tell the Court that she had yet to speak to Nichols before giving her testimony."  *Id.*, ¶ 442.  The complaint does not allege that Ms. Schmeckpeper failed to inform the court that her testimony was based on information she had gleaned from Ms. Niceta.  Accordingly, the complaint does not allege that Ms. Schmeckpeper misrepresented or omitted facts when testifying.

Ms. Nichols alleges that Ms. Valdez "represented to the Court that M.N. is reported to have had significant behavioral concerns," listed the behavioral concerns, "stated that M.N.'s teacher reported M.N. having problems following directions and being kind to her classmates," and "without documentation or support, claimed that M.N's pediatrician believed [some behavioral concerns] were a trauma response."  *Id.* at 54-55, ¶¶ 460-63.  However, Ms. Nichols does not allege that any of Ms. Valdez's statements were distortions or misrepresentations.  Ms. Nichols also does not allege

---

[27] Ms. Nichols also alleges that Ms. Schmeckpeper "misrepresented Nichols' mental health issues" because she did not inform the court that Ms. Schmeckpeper did not have "a diagnosis from a doctor that evaluated Nichols saying that Nichols had BPD and that her BPD posed a risk to M.N."  Docket No. 100 at 53, ¶ 450.  However, the complaint alleges that Ms. Niceta, not Ms. Schmeckpeper, testified that Ms. Nichols had BPD.  *Id.* at 52, ¶ 447.  It is therefore unclear why Ms. Schmeckpeper's failure to inform the court that she did not have a diagnosis from a doctor that Ms. Nichols has BPD would constitute a misrepresentation.

that Ms. Valdez omitted probative facts.[28]  Thus, the allegations in the complaint

concerning Ms. Schmeckpeper's and Ms. Valdez's representations to the court are not

comparable to the "reckless omission of probative facts to a magistrate" by the

defendants in *Malik*.  *See Malik*, 191 F.3d at 1316.  Therefore, *Malik* does not clearly

establish that the alleged conduct by Ms. Schmeckpeper and Ms. Valdez violated Ms.

Nichols' substantive or procedural due process rights under the Fourteenth

Amendment.

　　Because Ms. Nichols fails to meet her burden of demonstrating that Ms.

Schmeckpeper and Ms. Valdez violated her clearly established constitutional rights, the

Court finds that Ms. Schmeckpeper and Ms. Valdez are entitled to qualified immunity as

to Ms. Nichols' Fourteenth Amendment claims.  The Court will dismiss Ms. Nichols' first

and second claims against Ms. Schmeckpeper and Ms. Valdez with prejudice.

### 2.  ADA and RA Claim

　　The County Defendants argue that Ms. Nichols' fourth claim against Ms.

Schmeckpeper and Ms. Valdez should be dismissed because claims under ADA or RA

cannot be asserted against an individual.  Docket No. 113 at 10-11.  Ms. Nichols does

not respond to this argument.  The Court agrees that the ADA and RA do not provide for

individual liability.  *See Eboni S. ex rel Mary S. v. Pueblo Sch. Dist. 60*, 819 F. Supp. 2d

---

[28] The complaint alleges that "Ms. Valdez's false representations and omissions of relevant information to the Court allowed the Court to continue the restrictions on Nichols['] parenting time with M.N.," Docket No. 100 at 55, ¶ 464, but it does not explain what information Ms. Valdez falsely represented or omitted.  Although the complaint alleges that Ms. Valdez's claim about what M.N.'s pediatrician believed was "without documentation or support," *Id.*, ¶ 463, the complaint does not allege that Ms. Valdez misrepresented the pediatrician's beliefs or omitted that she lacked documentation or support.

1179, 1191 (D. Colo. 2011) ("As an initial matter, 'individual defendants in their individual capacities are not properly subject to suit under the Rehabilitation Act' or the ADA.") (quoting *Montez v. Romer,* 32 F. Supp. 2d 1235, 1241 (D. Colo. 1999)); *Dinkins v. Corr. Medical Servs.*, 743 F.3d 633, 634 (8th Cir. 2014); *Hayes v. Voong*, 709 F. App'x 494, 495 (9th Cir. 2018) (unpublished); *Badillo v. Thorpe*, 158 F. App'x 208, 211 (11th Cir. 2005) (unpublished).  Therefore, the Court will dismiss Ms. Nichols' fourth claim against Ms. Schmeckpeper and Ms. Valdez with prejudice.

### F.  Board of County Commissioners

The complaint does not allege that the Board itself acted unlawfully. [29]  However, the complaint alleges that the Board is "responsible for the oversight, supervision, discipline, and training" of ACDHS employees.  Docket No. 100 at 2, ¶ 4.  Ms. Nichols bases her claims against the Board on her allegations that ACDHS employees acted unlawfully.  *Id.* at 55-56, 59, 64-66, 68-70, ¶¶ 466-68, 470, 491-93, 495, 531, 547-549, 553, 559, 565-66, 569-74.  Ms. Nichols brings four claims against the Board: claim one, denial of procedural due process under the Fourteenth Amendment; claim two, denial of substantive due process under the Fourteenth Amendment; claim four, public entity discrimination in violation of the ADA and RA; and claim 5, failure to train under the Fourteenth Amendment.  *Id.* at 51-59, 63-70, ¶¶ 435-496, 528-574.

---

[29] Some allegations in the complaint, such as the allegation that the Board "regularly failed to conduct background checks on Niceta properly,"  Docket No. 100 at 67, ¶ 555, appear to allege action by the Board itself, but none of these allegations is sufficiently specific as to amount to a plausible allegation that the Board itself acted unlawfully.

### 1.  Eleventh Amendment Immunity

The County Defendants argue that Ms. Nichols' claims against the Board are barred by the Eleventh Amendment.  Docket No. 113 at 16-20.  "Only a state or 'arms' of a state may assert the Eleventh Amendment as a defense to suit in federal court." *Sutton v. Utah State School for the Deaf & Blind*, 173 F.3d 1226, 1232 (10th Cir. 1999) (citation omitted).  Although the County Defendants acknowledge that boards of county commissioners "most often will be deemed to perform local functions and are not entitled to Eleventh Amendment immunity," they argue that the Board is entitled to Eleventh Amendment immunity when it "serves state, not local functions."  Docket No. 113 at 17-18.  Ms. Nichols responds that the Board is not entitled to Eleventh Amendment immunity because it is not an arm of the state.  Docket No. 121 at 19-20.

To evaluate whether the Board is an arm of the state, and thus entitled to Eleventh Amendment immunity, the Court must first discuss Colorado's statutory scheme establishing the county-level departments of human services and the role that boards of county commissioners play in overseeing the county-level departments. Colorado law establishes a department of human or social services in each county. Colo. Rev. Stat. § 26-1-115(1).  The county-level departments "serve as agents of the state department and are charged with the administration of public assistance, and welfare and related activities in the respective counties in accordance with the rules of the state department."  Colo. Rev. Stat. § 26-1-118(1)(a).  Each county-level department consists of a county board of human services, a county director of human services, and "such additional employees as may be necessary for the efficient performance of public assistance and welfare activities."  Colo. Rev. Stat. § 26-1-115(1).  The county board of

human services is made up of the members of the board of county commissioners. Colo. Rev. Stat. § 26-1-116(1)(a). However, the county board of human services is required to "act in accordance with rules adopted by the state board when addressing public assistance, and welfare duties, responsibilities, and activities of the county department." Colo. Rev. Stat. § 26-1-116(3). The county departments of human services "shall serve as agents of the state department and are charged with the administration of public assistance, and welfare and related activities in the respective counties in accordance with the rules of the state department." Colo. Rev. Stat. § 26-1-118(1)(a).

ACDHS is the county-level department of human services in Adams County. Accordingly, the Board serves as the county board of human services for ACDHS. *See* Colo. Rev. Stat. § 26-1-116(1)(a). Ms. Schmeckpeper and Ms. Valdez are ACDHS caseworkers. Docket No. 100 at 3, ¶¶ 6-7. Therefore, to the extent that the Board trains or supervises Ms. Schmeckpeper and Ms. Valdez, it does so in its capacity as the county board of human services for ACDHS. Accordingly, the Court will determine whether the Board is subject to Eleventh Amendment immunity when acting in its capacity as the county board of human services for ACDHS ("ACDHS board").

The Colorado Supreme Court took up the question of whether a county board of human services constitutes an arm of the state in *Martin v. Dist. Ct. in and for Montrose Cnty.*, 550 P.2d 864 (Colo. 1976), *abrogated on other grounds by Colorado State Bd. of Educ. v. Adams Cnty. Sch. Dist. 14*, 537 P.3d 1 (Colo. 2023). In *Martin*, the court found that the county board is "set up as a subordinate agency or arm of the state" because (1) "[it] is bound by, inter alia, the fiscal and personnel rules set up by the state board of

social services;" (2) the director of the county department of human services, "while appointed by the county board, is subject to the policies, rules[,] and regulations of the state department;" and (3) Colorado statute "provides that counties are reimbursed eighty percent of the administrative costs (including staff salaries) of their programs[,] [p]rovided that state rules are complied with."  *Id.* at 865-66.

In *Steadfast Ins. Co. v. Agricultural Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007), the court held that "[w]e give deference to state court decisions regarding whether a given entity is an arm of the state, but we do not view these rulings as dispositive."  Accordingly, the Court will independently consider whether the Board is an arm of the state when acting in its role as the ACDHS board.

The Tenth Circuit has identified a two-step process for assessing whether an entity is an arm of the state.  *Hennessey v. University of Kansas Hospital Auth.*, 53 F.4th 516, 528-29 (10th Cir. 2022) (citing *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 978 (10th Cir. 1997)).  "As an initial, sometimes dispositive, step," the court evaluates four "primary factors:" (1) the character ascribed to the entity under state law; (2) the degree of control the state exercises over the entity; (3) the entity's finances, including the amount of state funding the entity receives and whether the entity had the ability to issue bonds or levy taxes on its own behalf; and (4) whether the entity is concerned primarily with local or state affairs, given the entity's function, composition, and purpose. *Id.* at 528 (citing *Steadfast Ins. Co.*, 507 F.3d at 1253).  "If these factors are in conflict and point in different directions, a court should proceed to the second step and consider the 'twin reasons' underlying the Eleventh Amendment—avoiding an afront to the

dignity of the state and the impact of a judgment on the state treasury." *Id.* (citing *Duke*, 127 F.3d at 978).

The Court will first evaluate the primary factors.  As to the first factor, Colorado law categorizes the county departments of human services as "agents of the state department" and states that the county departments consist of a county board of human services, a county director of human services, and additional employees.  Colo. Rev. Stat. §§ 26-1-115(1), 26-1-118(1)(a).  Because the ACDHS board is part of ACDHS, the Board is characterized by Colorado law as an agent of the state department of human services when fulfilling that role.  Therefore, the first factor weighs in favor of finding that the Board is an arm of the state when acting as the ACDHS board.

As to the second factor, Colorado law requires the county board of human services to "act in accordance with rules adopted by the state board when addressing public assistance, and welfare duties, responsibilities, and activities of the county department."  Colo. Rev. Stat § 26-1-116(3).  Therefore, the second factor weighs in favor of finding that the Board is an arm of the state when acting as the ACDHS board.

As to the third factor, the County Defendants point out that, although Adams County contributes twenty percent of the ACDHS budget, the state provides the remaining eighty percent.  Docket No. 113 at 14; *see* Colo. Rev. Stat. § 26-1-122(3)(b) ("if the county departments are administered in accordance with the policies and rules of the state department for the administration of county departments, eighty percent of the costs of administering . . . social services in the county departments shall be advanced to the county by the state treasurer . . . upon authorization of the state department.").  In fact, Colorado law provides that "[u]nder no circumstances shall any county expend

county funds in an amount to exceed its twenty percent share of actual costs for

. . .  social services activities," with the exception that a county department "may receive

and spend federal funds to which it is entitled by reason of the county's expenditures in

excess of" twenty percent.  Colo. Rev. Stat. §§ 26-1-122(1)(d), 26-1-122(4)(i).

Moreover, Colorado law does not grant county boards of human services the ability to

levy taxes.  *See Hennessey*, 53 F.4th at 533 ("The inability of an entity to levy taxes,

combined with its receipt of all or most of its funding from the state, will serve as a

strong indicator that the entity is an arm of the state.") (citing *Duke*, 127 F.3d at 980).

Therefore, the third factor weighs in favor of finding that the Board is an arm of the state

when acting as the ACDHS board.

As to the fourth factor, the ACDHS board is composed of local government

officials since it consists of the members of the Board.  *See* Colo. Rev. Stat. § 26-1-

116(1)(a).  However, the purpose and function of the ACDHS board is to enable

ACDHS to provide social services in Adams County in accordance with the rules of the

state department of human services.  The ACDHS board is required to act "in

accordance with rules adopted by the state board when addressing public assistance,

and welfare duties, responsibilities, and activities of the county department."  Colo. Rev.

Stat. § 26-1-116(3).  It has the power to "hold a meeting to address the public

assistance and welfare duties, responsibilities, and activities of the county department."

*Id.*  The ACDHS board is required to "appoint a county director, who is charged with the

executive and administrative duties and responsibilities of the county department,

subject to the policies and rules of the state department . . . and who serves as a

secretary to the county board, unless a secretary is otherwise appointed by the board,"

and to establish the salary of the county director.  Colo. Rev. Stat. § 26-1-117(1).  The

ACDHS board is also tasked with approving the staff appointed by the county director.

Colo. Rev. Stat. § 26-1-119.  Based on this state statutory scheme, the Court finds that,

when it is acting as the ACDHS board, the Board is primarily concerned with state

affairs.  Therefore, the fourth factor weighs in favor of finding that the Board is an arm of

the state when acting as the ACDHS board.

Because all four factors indicate that the Board acts as an arm of the state when

it is fulfilling its role as the ACDHS board, the Court finds that it is entitled to Eleventh

Amendment immunity from claims relating to its performance of this role.  *See*

*Hennessey*, 53 F.4th at 528.

### 2.  Fourteenth Amendment Claims

The Eleventh Amendment bars § 1983 claims against an arm of the state that

has invoked sovereign immunity.  *Colby v. Herrick*, 849 F.3d 1273, 1276-78 (10th Cir.

2017); *see also Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1196 (10th Cir. 1998)

(holding that § 1983 did not abrogate Eleventh Amendment immunity).  Because the

Board has invoked sovereign immunity, *see* Docket No. 113 at 16-20, and the Court has

found that it is entitled to sovereign immunity under the Eleventh Amendment from

claims asserted against it in its capacity as the ACDHS board, the Court will dismiss Ms.

Nichols' first, second, and fifth claim against the Board with prejudice.

### 3.  ADA Claim

The County Defendants argue that Ms. Nichols' ADA claim against the Board

should be dismissed because respondeat superior liability is not available under the

ADA.  *Id.* at 14-15.  However, as this Court has previously pointed out, "numerous

circuit courts have concluded that the ADA provides for respondeat superior liability," and there is no Tenth Circuit decision to the contrary.  *M.P. by and through Jared P. v. Jones*, No. 22-cv-00220-PAB-KAS, 2023 WL 5938915, at *15 (D. Colo. Sep. 12, 2023) (collecting cases).  Therefore, the Court will not dismiss Ms. Nichols' ADA claim against the Board on this ground.  Instead, the Court will consider the County Defendants' argument that Ms. Nichols' ADA claim against the Board is barred by the Eleventh Amendment.  *See* Docket No. 113 at 19-20.

In *United States v. Georgia*, 546 U.S. 151, 159 (2006), the Supreme Court held that, "insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."  Under the *Georgia* framework, "courts must 'determine in the first instance, on a claim-by-claim basis, . . . which aspects of the State's alleged conduct violated Title II.'"  *Brooks v. Colorado Dept. of Corrections*, 12 F.4th 1160, 1168 (10th Cir. 2021) (quoting *Georgia*, 546 U.S. at 159).  "If a court concludes that some aspects of a state's conduct violated Title II, it should then move on to determine whether that conduct violated the Fourteenth Amendment."  *Id.* (citing *Georgia*, 546 U.S. at 159).  "Finally, at step three of the framework, courts should consider the following: 'insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.'"  *Id.* (quoting *Georgia*, 546 U.S. at 159).  Accordingly, the Court will first consider whether the complaint plausibly alleges that some aspects of the Board's conduct violated Title II.

"To state a claim under Title II of the ADA, a plaintiff must allege: (1) that [she] is a qualified individual with a disability; (2) that [she] was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *A.V. ex rel. Hanson v. Douglas Cnty. Sch. Dist. RE-1*, 586 F. Supp. 3d 1053, 1062 (D. Colo. 2022). Under the ADA, a "qualified individual with a disability" is "an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The ADA's definition of an individual with a disability includes an individual who is "regarded as" having a disability. 41 U.S.C. § 12102(1)(C); *see Adair v. City of Muskogee*, 823 F. 3d 1297, 1306 (10th Cir. 2016). An individual is "regarded as" having a disability if she has been "subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment." 41 U.S.C. § 12102(3)(A).

The complaint alleges that Ms. Valdez regarded Ms. Nichols as having bipolar depression and that Ms. Schmeckpeper regarded Ms. Nichols as struggling with her mental health. Docket No. 100 at 13, 22, ¶¶ 97-98, 183. The complaint also alleges that ACDHS employees "regularly stated that Nichols suffered from either Bi-Polar [sic] Depression or BPD," and that ACDHS employees "regularly repeated the [BPD] diagnosis as if it was a fact[ ] in testimony to the court and its own assessments and [FTMs]." *Id.* at 68, ¶¶ 560, 563. The complaint alleges that ACDHS "used Nichols' mental health as a reason not to allow Nichols full supervision over M.N.," "prevented

Nichols from having supervised or unsupervised time with her daughter because of her disability," and "gave all benefits to Niceta because she was not disabled and held everything against Nichols because of her disabilities."  *Id.* at 65, ¶¶ 537, 540, 544.

Ms. Nichols argues that she "has pleaded facts to establish the qualified individual with a disability element" because the complaint alleges that Ms. Nichols suffers from depression and that she was regarded as having BPD.  Docket No. 121 at 18.  However, to be a "qualified individual with a disability" under the ADA, an individual must not only have a disability, but must also "meet[ ] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  Ms. Nichols fails to allege that she is a qualified individual with a disability under the ADA because she does not address this second requirement.  The complaint alleges that ACDHS did not allow Ms. Nichols "full supervision over M.N." and that it "prevented Nichols from having supervised or unsupervised time with her daughter," Docket No. 100 at 65, ¶¶ 537, 540, but does not allege that Ms. Nichols was otherwise eligible to have full supervision over M.N. or have supervised or unsupervised time with her.  In addition, the complaint alleges that ACDHS "gave all benefits to Niceta," *id.*, ¶ 544, but does not explain what these "benefits" entailed or allege that Ms. Nichols met the essential eligibility requirements to receive such benefits.  Therefore, the complaint fails to allege that Ms. Nichols is a "qualified individual with a disability" and fails to state a claim under Title II of the ADA. Accordingly, the Court will dismiss Ms. Nichols' ADA claim against the Board without prejudice.

### 4. RA Claim

Under the RA, no "otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The inquiry as to whether a plaintiff has alleged that she is a "qualified individual with a disability" is the same under the RA as the ADA.  *See Miller ex rel. S.M. v. Board of Educ. of Albuquerque Public Schools*, 565 F.3d 1232, 1245 (10th Cir. 2009) (holding that, because the relevant provisions under the ADA and RA "involve the same substantive standards," courts should "analyze them together").  As discussed above, the complaint fails to allege that Ms. Nichols is a "qualified individual with a disability." Accordingly, the Court will dismiss her RA against the Board without prejudice.

## IV. CONCLUSION

Therefore, it is

**ORDERED** that Defendant City of Aurora's Motion to Dismiss Plaintiff's Fourth Amended Complaint [ECF 100] [Docket No. 112], Adams County Defendants' Motion to Dismiss Plaintiff's Fourth Amended Complaint [ECF 100] [Docket No. 113], Defendant Moss's Motion to Dismiss [Docket No. 114], Defendant Jennifer Conn's Renewed Motion to Dismiss Plaintiff's Fourth Amended Complaint [Docket No. 115], and Defendant Police Chief Wilson's Motion to Dismiss Plaintiff's Fourth Amended Complaint and Request for Jury Trial (ECF 100) [Docket No. 119] are **GRANTED**.  It is further

**ORDERED** that Ms. Nichols' first, second, third, fifth, and sixth claims are **DISMISSED with prejudice**.[30]  It is further

**ORDERED** that Ms. Nichols' seventh and eighth claims are **DISMISSED without prejudice**.  It is further

**ORDERED** that Ms. Nichols's fourth claim, insofar as it is asserted against Ms. Conn, Ms. Schmeckpeper, and Ms. Valdez, is **DISMISSED with prejudice**.  It is further

**ORDERED** that Ms. Nichols' fourth claim, insofar as it is asserted against the Board, is **DISMISSED without prejudice**.  It is further

**ORDERED** that this case is closed.


DATED February 21, 2024.

BY THE COURT:

s/ Philip A. Brimmer
PHILIP A. BRIMMER
Chief United States District Judge

---

[30] Dismissal with prejudice is proper only "where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend."  *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001) (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 806 (10th Cir. 1999)). Furthermore, a "dismissal with prejudice is appropriate when the defendants are immune from suit and further amendment of the plaintiff's complaint would be futile." *Gabriel v. El Paso Combined Cts.*, 842 F. App'x 231, 235 (10th Cir. 2021) (unpublished) (citing *McKinney v. Okla., Dep't of Human Servs.*, 925 F.2d 363, 365-66 (10th Cir. 1991).  The Court finds that Ms. Nichols' claims should be dismissed with prejudice because granting Ms. Nichols leave to amend her complaint for a fifth time with respect to these claims would be futile and the Board is immune from suit as to these claims.